**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLANIA**

| | | |
|---|---|---|
| KIMBERLY ANDREWS | : | |
| | : | |
| Plaintiffs, | : | **Case No.**   2:19-cv-670 |
| | : | |
| v. | : | |
| | : | |
| ORLANDO HARPER, Warden of Allegheny | : | |
| County Jail; DAVID ZETWO, Chief Deputy | : | **ELECTRONICALLY FILED** |
| Warden; JASON BEASOM, Deputy Warden; | : | |
| LAURA WILLIAMS, Chief Deputy Warden of | : | |
| Healthcare Services; CORRECTIONAL | : | **JURY TRIAL DEMANDED** |
| OFFICER RHODES | : | |
| | : | |
| Defendants. | | |

## Complaint

Plaintiff Kimberly Andrews, by and through her undersigned counsel, files the following Verified Complaint.

### Jurisdiction and Venue

1.      This case is brought pursuant to 42 U.S.C.§ 1983 and the Fourteenth Amendments to the United States Constitution, seeking injunctive relief, including a permanent injunction, preliminary injunction and temporary restraining order to remove her from solitary confinement at the Allegheny County Jail which is threatening to her life and health.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

3.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

### Parties

4.      Plaintiff Kimberly Andrews is twenty-years-old and is currently facing two misdemeanor charges while incarcerated as a pretrial detainee at the Allegheny County Jail (ACJ). She has been kept in solitary confinement for over 70 days by Defendants at the jail, although she

has not been either charged with or convicted of any violent conduct by officials at the jail. She has a history of mental illness, which is greatly exacerbated by her placement and retention in isolation. She has attempted suicide three times since being placed in solitary confinement.

5.    Orlando Harper is the Warden at the ACJ. Defendant Harper is sued in his official capacity.

6.    David Zetwo is the Chief Deputy Warden of the ACJ. Defendant Zetwo is sued in his official capacity.

7.    Jason Beasom is the Deputy Warden of the ACJ. Defendant Beasom is sued in his official capacity.

8.    Laura Williams is the Chief Deputy Warden of Healthcare Services at the ACJ. Defendant Williams is sued in her official capacity.

9.    Correctional Officer Rhodes is employed at the ACJ. Defendant Rhodes is sued in her official capacity.

## Statement of Facts

10.    In early February 2019, an officer from the Allegheny County Sheriff's Office traveled to Atlanta, Georgia to effectuate the extradition of Plaintiff, Kimberly Andrews, back to Pittsburgh, Pennsylvania so that she could face outstanding criminal charges in three cases amounting to four misdemeanors and one summary offense.

11.    Kimberly Andrews was taken into custody at the ACJ on February 8, 2019.

12.    Since then the summary offense and one misdemeanor she was facing have been withdrawn. She pled guilty to another misdemeanor charge and was sentenced to 30-60 days of incarceration, which she subsequently served. She remains in jail as a pretrial detainee awaiting trial on two misdemeanor charges.

2

13.    Allegheny County Court of Common Pleas Judge Anthony Mariani has refused to release her on bond ahead of trial.

14.    Ms. Andrews was placed in solitary confinement at ACJ at the age of 19 and turned 20 years of age on May 25, 2019 while in solitary confinement at the ACJ.

15.    Prior to her incarceration Ms. Andrews was diagnosed with numerous, serious psychiatric disorders. She currently suffers from Bipolar Disorder, Post-Traumatic Stress Disorder, Anxiety Disorder, and Oppositional Defiance Disorder.

16.    Ms. Andrews was first diagnosed with Bipolar Disorder around the age of thirteen.

17.    Bipolar Disorder is defined by the American Psychological Association (APA) as "a serious mental illness in which common emotions become intensely and often unpredictably magnified. Individuals with bipolar disorder can quickly swing from extremes of happiness, energy and clarity to sadness, fatigue and confusion. These shifts can be so devastating that individuals may choose suicide." *See* https://www.apa.org/topics/bipolar/.

18.    "The lifetime risk of suicide in individuals with bipolar disorder is estimated to be at least 15 times that of the general population. In fact, bipolar disorder may account for one-quarter of all completed suicides." Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, American Psychiatric Association (hereafter "DSM-V"), p. 131.

19.    Ms. Andrews was first diagnosed with Post-Traumatic Stress Disorder (PTSD) at ten years old.

20.    PTSD is described by the APA as "an anxiety problem that develops in some people after extremely traumatic events," causing people with PTSD to "relive the event via intrusive memories, flashbacks and nightmares" and causing them to avoid anything reminding them of the event and having anxiety that is "so intense their lives are disrupted." *See* https://www.apa.org/topics/ptsd/index.

21.    "PTSD is associated with suicidal ideation and suicide attempts, and presence of the disorder may indicate which individuals with ideation may eventually make a suicide plan or actually attempt suicide." DSM-V, p. 278.

22.    Ms. Andrews was first diagnosed with Anxiety Disorder at the age of ten.

23.    Anxiety Disorder is characterized by recurring intrusive thoughts and physical symptoms such as sweating, trembling, dizziness or a rapid heartbeat. https://www.apa.org/topics/anxiety/index. Individuals with anxiety disorder find that "[t]he intensity, duration, or frequency of the anxiety and worry is out of proportion to the actual likelihood or impact of the anticipated event. The individual finds it difficult to control the worry and to keep worrisome thoughts from interfering with attention to tasks at hand." DSM-V, p. 222.

24.    Ms. Andrews was first diagnosed with Oppositional Defiance Disorder at ten years old.

25.    Oppositional Defiance Disorder has as its essential feature "a frequent and persistent pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness." DSM-V, p. 463. Symptoms include "high levels of emotional reactivity [and] poor frustration tolerance." *Id.* at 464.

26.    Ms. Andrews also has a history of committing acts of self-harm, including suicide attempts. The first attempt took place while she was only nine years old, and there have been at least 20 other attempts prior to her current incarceration at ACJ.

27.    Ms. Andrews most recent suicide attempt, prior to her incarceration, took place while she was 18. In the time since that attempt, she reports she had felt stable, mentally, emotionally, and psychologically. She had found employment, exercised frequently, was receiving therapy and taking her prescribed medications. She had even begun to attend church.

28.     Ms. Andrews also has epilepsy and as a consequence is prone to seizures. She has been sent to the hospital at least five times during her incarceration at ACJ due to the onset of seizures related to her condition.

29.     Ms. Andrews has asthma.

30.     Additionally, Ms. Andrews has a heart murmur.

31.     As discussed in more detail *infra*, there now exists an obligatory consensus among psychiatric experts, correctional experts, and courts that the well-known, clearly established risks and harms of solitary confinement are so severe – potentially fatal – that individuals with serious mental illness such as Ms. Andrews are to be precluded from such conditions of confinement altogether.

32.     The State of Pennsylvania agrees that mentally ill prisoners will not be placed and retained in solitary confinement units due to the severe risk of deterioration and draconian harm that is likely to occur to such prisoners. *See* "The Pennsylvania prison system will stop putting mentally ill inmates in solitary," Mark Berman, Washington Post, January 8, 2015; "No Safe Harbor, Part II: Prisons cope with mental health," Rich Lord and Joe Smydo, Pittsburgh Post-Gazette, Feb. 7, 2016.

33.     Despite the undeniable pain, suffering, and risk of acute psychological decompensation inherent when imposing solitary confinement on people with serious mental illness, there is not a day that goes by in which defendants are not holding substantial numbers of people with serious mental illness in such torturous, suicide-inducing conditions of isolation.

34.     Ms. Andrews has been subjected to more than 70 days in solitary confinement since her incarceration at ACJ began on February 8, 2019. Her mental health has suffered immensely as a consequence, leading to three recent suicide attempts.

5

35.    Defendants are continuing to hold Ms. Andrews in solitary confinement without any justifiable security reason. Their conduct betrays a callous disregard for her health, her constitutional rights, and her very life.

36.    Each day Ms. Andrews remains in solitary confinement her life is in grave danger.

*Kimberly Andrews' Conditions of Incarceration: Solitary Confinement, Mental Health Crises, Suicidality, and Excessive Force*

37.    Upon arrival at the ACJ, Ms. Andrews was housed on 5MD under regular observation.

38.    Those held under the regular observation regime are permitted out of their cell multiple times throughout the day, including for recreation, day room, showers, phone calls, and other services and activities. Some incarcerated people are also able to work various jobs in ACJ. On average, most have at least 4-6 hours outside of their cell every day; pod workers spend nearly all of their day outside their cell.

39.    Ms. Andrews remained under regular observation until Feb. 28, 2019, when she was placed in solitary confinement on Restricted Housing Unit (RHU) status pending a misconduct hearing.

40.    On or about Feb. 27, at approximately 8:00pm, Ms. Andrews had a seizure. She awoke approximately four hours later, laying in her own vomit and urine. At approximately 3:00am the following morning, she was still vomiting. Only then – nearly eight hours after her original episode – did staff attend to her.

41.    The first misconduct allegation arose after Ms. Andrews overheard the C/O on duty speaking to another incarcerated person, discussing specific and personal health information. Ms. Andrews reacted verbally. She was written up for 'refusal to lock in'.

42.    The second misconduct arose after Ms. Andrews was already in RHU. She commented about a leash-like instrument used to tether incarcerated people in ACJ and stated

she was not a dog. C/O Day responded, "You'll be my dog today." Ms. Andrews responded verbally. She was written up for threatening staff/causing a disruption.

43.    Ms. Andrews was never provided any paperwork identifying the misconducts she was accused of committing.

44.    After 11 days, Ms. Andrews finally had a hearing. Despite never receiving any written notice of the charges against her, she was found guilty of threatening staff/causing disruption and sentenced to 50 days in the RHU.

45.    While in the RHU, Ms. Andrews was forced to spend at least 23 hours of every day in a tiny concrete cell. The cell is approximately 10 X 7 feet.

46.    On the weekdays, if staff complied with policy, Ms. Andrews was let out for one hour into a cage where she could exercise alone. The cage had no exercise or athletic equipment, or anything whatsoever within it.

47.    Incarcerated people in the RHU, including Ms. Andrews, are deprived of any hygiene items. Ms. Andrews was not permitted soap, toothpaste, or a toothbrush during her 50 days in solitary confinement.

48.    Ms. Andrews had a single book and no writing implement in the RHU.

49.    Ms. Andrews was denied all phone calls and visits while in the RHU.

50.    While in solitary confinement Ms. Andrews' mental health deteriorated. She suffered severely increased anxiety, depression, inability to concentrate, obsessive thoughts, and struggled with impulses to commit suicide.

51.    The symptoms Ms. Andrews experiences in solitary confinement are well-documented, predictable responses to isolation for individuals suffering from the serious psychiatric disorders Ms. Andrews has.

52. On or about April 18, 2019, Ms. Andrews 50 day RHU confinement ended and she returned to the general population and regular observation status.

53. While in general population under regular observation, Ms. Andrews' mental health improved due to her no longer being held in solitary confinement. She adjusted well and obtained a job as a pod worker.

54. Her duties included passing out food trays, cleaning cells, painting walls and other parts of the interior, and retrieving and delivering items for other people incarcerated in 5MD. In this position, Ms. Andrews spent the majority of her day outside of her cell, only returning briefly when counting occurred.

55. On or about May 7, 2019, Ms. Andrews got into a verbal disagreement with another incarcerated person. Ms. Andrews returned to her cell. That person then got into a disagreement with a staff member; Ms. Andrews was not involved in that argument. However, Ms. Andrews was subsequently given a misconduct charge for getting into a physical altercation and/or inciting a riot. She was later found not guilty of those charges after a hearing on June 1, 2019.

56. Ms. Andrews was never provided with any documentation of that alleged misconduct.

57. Because of the misconduct charge of getting into a physical altercation, Ms. Andrews was returned to solitary confinement on RHU status on or about May 7, 2019.

58. Again, Ms. Andrews was held in 23-24 hour solitary confinement without any hygiene items or other property.

59. Again, Ms. Andrews mental health began to deteriorate, with increased anxiety, agitation, depression, and heightened risk of attempting suicide.

60. On May 20, 2019, Ms. Andrews returned to her cell from a shower and found a pile of medication on her desk, and not in the typical dispensation container. Some of the medication

8

appeared different from that Ms. Andrews was prescribed. Additionally, as this was not the proper protocol for dispensing medication, Ms. Andrews refused to take it due to her concern it was not the correct medication and that she may be disciplined for taking medication in violation of proper procedure. She was also concerned what effect the unknown medication could have on her health.

61.    Ms. Andrews pressed the intercom button in her cell and told the C/O who was on duty about the issue with her medication. The C/O told her she would not contact medical staff about the issue, as the medication was disbursed in such a manner at C/O Rhodes' request and that if Ms. Andrews was not going to take the medication, she should "just flush them [down the toilet]". Ms. Andrews refused to flush the medication down the toilet, knowing this too was not proper procedure. She instead requested her proper medication to be provided according to protocol, as she knew without her medications, she was at risk of both physical complications, relating to her epilepsy, and psychological decompensation.

62.    The following day, Ms. Andrews began to decompensate as a result of not being provided her medication according to procedure. She used the intercom to request intervention of mental health staff as she felt the onset of a mental health crisis.

63.    C/O Rhodes ignored her request, telling her "I don't give a fuck" and to "stop pushing the button." Ms. Andrews spoke with Sgt. Lee about C/O Rhodes' conduct.

64.    Ms. Andrews was later issued another misconduct for allegedly threatening to spit on Correctional Officer (C/O) Rhodes on May 21, 2019.

65.    Ms. Andrews subsequently covered her cell window with loose papers, and urged for an adequate response. While making rounds C/O Rhodes stopped at her cell and said, "I don't care that you talked to the Sergeant, you can go kill yourself, I will still run this pod."

66.     C/O Rhodes' words provoked Ms. Andrews, setting off an acute psychiatric crisis. Ms. Andrews tore strips off of her mattress, and along with a torn shirt, wrapped them around her neck and tried to strangle herself.

67.     At least 45 minutes had passed, including one round of security checks, before Ms. Andrews was attended to by staff. By that point, she had lost consciousness.

68.     Ms. Andrews was removed from her cell and taken to Allegheny General Hospital for treatment. She spent the night in the hospital.

69.     When Ms. Andrews returned to ACJ the following day she was placed in a holding cell in intake. She was calm and her mental health condition had stabilized. She no longer felt suicidal ideation.

70.     Ms. Andrews informed staff she did not feel like harming herself and she objected to being told she was to be placed in an anti-suicide smock and placed in a psychiatric observation cell (POC).

71.     The anti-suicide smocks are thin and expose a person to anybody looking into their cell. Ms. Andrews also did not want to be in the POC because the cell has a glass front, and a camera, and anybody on the unit, including male staff, can watch her in the cell with little to cover her body.

72.     Because of her objection to being placed in an anti-suicide smock in the POC due to her being psychologically stable, staff informed her they were going to use force. After retrieving the smock, they decided to attack her with pepper spray, firing the spray through the slot in the cell door while Ms. Andrews, an asthmatic, was sitting calmly on the bed. She did not have access to her medically-necessary inhaler. Staff filmed the encounter; Ms. Andrews was completely naked for the entire duration of the ordeal.

73. The use of pepper spray, a respiratory irritant, on individuals suffering from asthma can result in serious, and potentially fatal, health complications.

74. Ms. Andrews was then forcibly taken from her cell and moved to another cell that contained a so-called restraint chair. Straps were fastened around each shoulder, her waist, both wrists, and her feet.

75. Ms. Andrews was left in the chair for at least 6 consecutive hours without food, bathroom break, the ability to move or exercise her limbs, and not provided any medical check.

76. When she was removed from the restraint chair Ms. Andrews was taken to pod 5MD, the women's mental health pod, and returned to solitary confinement on RHU status.

77. Even though she was and remains in a mental health pod, being on RHU status means that she is placed in solitary confinement, in the same and in some respects even worse conditions than non-mentally ill prisoners in RHU status are confined in.

78. In addition to the aforementioned RHU conditions of isolation set forth *infra*, on 5MD those on RHU status are deprived any exercise. When offered the opportunity to be released from their cell for an hour, instead of being allowed to go exercise in the cage, they are shackled to the table in the day room, unable to move. This is what Ms. Andrews has been subjected to since she has been placed in the 5MD pod on RHU status.

79. Ms. Andrews still had not had a hearing on either of the misconduct charges of that resulted in her being placed back in solitary confinement.

80. On Saturday, May 25, Ms. Andrews' birthday, she was visited by two attorneys. They were deprived a confidential visit and forced to meet with her on the housing unit, speaking through the cell door.

11

81.    Counsel prepared a letter on her behalf to Warden Harper and sent it care of an attorney for the Allegheny County Law Department, John Bacharach. SEE Exhibit A, Letter from counsel.

82.    The letter demanded that Ms. Andrews be released from solitary confinement, stating: "A growing consensus of courts, human rights advocates, prison officials and systems have recognized that individuals with such serious psychiatric conditions as Ms. Andrews are to be precluded from solitary confinement due to the grave risk of psychological pain, decompensation, and increased risk of suicidality associated with this type of isolation."

83.    Defendant Harper and his staff refused to take any action, displaying a brazen disregard for the Constitution and Ms. Andrews' health.

84.    Ms. Andrews was visited a second time by one of the attorneys, on Wednesday, May 29, in which again they were deprived a confidential visit and forced to meet with her on the housing unit for the first hour of their encounter.

85.    Ms. Andrews complained of chest pains, to which she alerted staff and requested medical assistance, but her requests were not honored.

86.    Solitary confinement, in addition to deleterious effects on mental health and psychological wellbeing, can likewise exacerbate or aggravate physical health conditions.

87.    Ms. Andrews also related she had begun to "see things" and was feeling drowsy and disoriented – all signs of vulnerability to further decompensation and all of which were relayed to both medical and security staff.

88.    Approximately two days later, on or about Friday, June 1, Ms. Andrews finally had her misconduct hearing on the charges against her. She had already spent more than three weeks in solitary confinement. She was found not guilty of the physical altercation/inciting a riot

misconduct, but found guilty of the misconduct alleging that she threatened to spit on C/O

Rhodes. She was sentenced to 25 days in the RHU.

89.    The prospect of continuing in solitary confinement provoked another episode of

acute decompensation. Ms. Andrews ripped her shirt into strips and again commenced to

manually strangle herself in another suicide attempt.

90.    Ms. Andrews had pushed her bed against the door prior to doing this, and had her

head positioned close to the door, requiring staff to look in and down in order to see her head.

91.    Ms. Andrews lay on her bed for approximately one-hour prior to staff discovering

that she had attempted suicide again. She had begun to bleed from the nose and lose coloration

in her face. Staff had made at least two rounds to pass out meals and medication, but did not

bother to look into her cell. If they did, they would have seen that she needed immediate

medical attention.

92.    Ms. Andrews was again taken to Allegheny General Hospital.

93.    Upon returning to ACJ, Ms. Andrews was being escorted by Sgt. Tucker in the

intake area. Sgt. Tucker fell behind, and when questioned where she was by Ms. Andrews, Sgt.

Tucker told her to "shut the fuck up." Ms. Andrews responded in kind. The two continued to

argue on the way to the elevator.

94.    Sgt. Tucker then forcefully pushed Ms. Andrews into the elevator, causing her to hit

her head and fall. Sgt. Tucker then fired a taser into her back. Following this attack, several other

guards piled onto Ms. Andrews. She was then tased again. She lost consciousness and awoke in

the restraint chair.

95.    Ms. Andrews spent at least 8 consecutive hours in the restraint chair, strapped in so

tight that it caused bruising around her wrists and shoulder areas. She was again deprived food,

water, bathroom breaks, or any ability to move her limbs. Staff returned at one point to loosen

the strap on her right wrist, as it was cutting into her flesh. Ms. Andrews asked for her inhaler, but her request was denied; no other medical checks were conducted.

96.    Ms. Andrews was returned to solitary confinement status in 5MD, where she remains at the time of filing, in a state of extreme psychological vulnerability.

97.    On June 7, 2019, after struggling to sleep for several days, Ms. Andrews was awoken by loud music being played by two correctional officers. She requested they turn down the music. They responded, "Shut the fuck up", calling her a "retard". In an effort to force contact with the sergeant, Ms. Andrews flooded the cell. The C/O refused to call the sergeant.

98.    Ms. Andrews then threatened suicide. The C/O entered and removed her mattress. She tore the pages out of her only book, and used the papers to cover the window. She ripped an extra uniform she had used for warmth into strips and tied a makeshift noose to the table in her cell and around her neck.

99.    Ms. Andrews lost consciousness. It was at least 15 minutes before staff attended to her. CPR was needed to revive her; the middle of her rib cage on her left side was injured and continues to hinder her movement and breathing.

100.    Ms. Andrews was again taken to Allegheny General Hospital.

101.    As of Sunday, June 9, 2019, she is housed in a cell with no mattress and no blanket. There is blood and fecal contamination in the cell. On Sunday, Ms. Andrews had a seizure, after having missed meals in the hospital and being unable to take her medication due to her refusing food as a result of the contamination in the cell.

102.    The imposition of such conditions of solitary confinement on a human being suffering from Bipolar Disorder, PTSD, Anxiety Disorder, and Oppositional Defiance Disorder, who had attempted suicide on three occasions in a span of eighteen days due to predictable episodes of decompensation is shocking, inhumane, and illegal.

103. Without court intervention, Ms. Andrews is in jeopardy of further injury, up to and including death, due to her being placed in conditions of confinement that when imposed on those with serious mental illness have been described by one court as akin to "putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez,* 889 F.Supp. 1146, 1265 (N.D. Cal. 1995).

*Defendants Role and Responsibility in Plaintiff's Conditions of Confinement*

104. C/O Rhodes' unconscionable act in encouraging Ms. Andrews to commit suicide, combined with her refusal to respond to her mental health crisis by summoning appropriate medical and mental health staff and providing with her proper medications, has injured and traumatized Ms. Andrews.

105. C/O Rhodes has acted in a manner that is objectively unreasonable, manifesting deliberate indifference to Ms. Andrews' health and life, and she has even acted with malicious intent when she successfully provoked Ms. Andrews to attempt to take her own life.

106. Ms. Andrews, accordingly, must be separated from C/O Rhodes. Defendant Rhodes cannot be trusted to conduct herself professionally, she presents a risk to Ms. Andrews, and any interaction between the two presents a risk of re-traumatizing Ms. Andrews, provoking another mental health crisis.

107. Defendants Harper, Zetwo, Beasom, and Williams are responsible for the overall operation of the ACJ, including housing and classification policy and decisions, disciplinary matters, and the provision of medical and mental health care.

108. Each is aware that people with serious mental illness are routinely placed in RHU status, often suffering the predictable debilitating consequences to their mental health.

109. ACJ provides for no exclusion from the RHU based on a person's serious mental illness and/or their suicide risk.

110. Instead, defendants and their staff routinely punish people whose rule violations are directly attributable to their mental health conditions with placement into solitary confinement.

111. Defendants were made aware of the specific risks to Ms. Andrews by a letter from counsel on May 29, 2019. Not only did none of them take efforts to protect Ms. Andrews from the dire threat posed by solitary confinement to her health and her life, but ACJ staff actually sentenced her to *additional* time in solitary confinement two days after receiving the letter from counsel.

112. And even after Ms. Andrews again decompensated and committed serious self-harm, attempting to take her life, defendants remain steadfast in their refusal to release her from solitary confinement.

113. Ms. Andrews is in need of court intervention to provide relief for conditions analogous to "putting an asthmatic in a place with little air to breath." She has thrice already exhausted the little air provided to her, so to speak, and the next time could very well be her last.

114. Such disregard by defendants is not unusual for ACJ. The jail has a suicide rate more than twice the national average.

115. Rather than assess causal factors of suicidality like solitary confinement, or revise their own inadequate suicide prevention protocols, the defendants have decided to spend more than $200,000 stripping people incarcerated of ACJ with normal bedding, replacing sheets with anti-suicide blankets. In essence, defendants have conceded that mere presence in the ACJ is itself a sufficient causal factor for suicide that they have turned every cell in their entire facility into a supposedly anti-suicide cell.

116. The only other facility that counsel for Plaintiff is aware of to have undertaken such a draconian, sweeping, and ultimately ineffective suicide prevention policy – removing all blankets – is the U.S. military prison in Guantanamo Bay.

117.    These measures have not prevented Ms. Andrews from attempting to commit suicide on three occasions.

118.    Forcing Ms. Andrews to remain in solitary confinement with the demonstrated risk to her life manifests deliberate indifference to her health. Defendants are aware of this risk due to its being obvious, requests from Ms. Andrews herself, communications from Ms. Andrews' counsel, and her own repeated suicide attempts that occurred during episodes of acute decompenations in solitary confinement.

119.    Defendants' conduct is objectively unreasonable and deliberately indifferent to conditions of confinement that deprive her of basic human needs. No penological interest justifies Defendants placing Ms. Andrews' mental health and her life in grave danger in order to impose a 25-day period of solitary confinement for an alleged verbal, non-violent infraction.

### Causes of Action

### COUNT I – Plaintiff's Solitary Confinement Violates the Fourteenth Amendment to the U.S. Constitution – Against Defendants Harper, Zetwo, Beasom, and Williams

120.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 120 of this Complaint as if fully set forth herein.

121.    Defendants Harper, Zetwo, Beasom, and Williams are holding Ms. Andrews in solitary confinement despite her serious mental illness and the clear risk of suicide when a person with her mental state is held in such conditions. Defendants are doing so despite the diagnosis of mental illness that she has and despite her two recent suicide attempts. Defendants are doing so pursuant to a policy and practice that routinely results in people with serious mental illness being held in solitary confinement. Defendants are further making a specific decision to keep Ms. Andrews in the RHU despite counsel having brought the

17

matter to their attention. They have deliberately chosen to disregard the obvious and intolerable risk of keeping Ms. Andrews in solitary confinement.

122.     Solitary confinement is depriving Ms. Andrews of the basic human needs of mental and physical health, resulting in three suicide attempts and subsequent physical injuries and hospitalizations.

123.     Solitary confinement of Ms. Andrews exposes her to a substantial risk of serious harm in violation of the Fourteenth Amendment to the U.S. Constitution.

### COUNT II – Defendant Rhodes' Conduct Violates the Fourteenth Amendment to the U.S. Constitution – Against C/O Rhodes

124.     Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 120 of this Complaint as if fully set forth herein.

125.     Defendant Rhodes violated Plaintiff's rights by refusing her urgent request for mental health treatment on or about May 21, 2019, when Ms. Andrews was decompensating due to her not being properly provided her medication.

126.     Defendant Rhodes violated Plaintiff's right by actively encouraging her to commit suicide.

127.     Such conduct is objectively unreasonable and deliberately indifferent to Ms. Andrews' serious need for mental health care and her risk of suicide.

### Prayer for Relief

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.     Issue a Temporary Restraining Order enjoining defendants from holding Plaintiff in solitary confinement;

B.      Issue a Temporary Restraining Order enjoining defendant Rhodes from any contact

with Plaintiff;

C.      Enter a Preliminary and Permanent Injunction enjoining defendants from placing

plaintiff in solitary confinement and enjoining defendant Rhodes from any contact

with Plaintiff;

D.      Grant attorneys' fees and costs;

E.      Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a jury.


/s/ Bret Grote
Legal Director
PA I.D. No. 317273
bretgrote@abolitionistlawcenter.org
/s/ Quinn Cozzens
Staff Attorney
PA I.D. No. 323353
qcozzens@alcenter.org
Swain Uber, of counsel*
swain.uber@gmail.com
PA I.D. No. 323477
Abolitionist Law Center
PO Box 8654
Pittsburgh, PA 15221
412-654-9070

/s/ Jules Lobel*
N.Y. Bar No. 1262732
3900 Forbes Avenue
Pittsburgh, PA 15260
Telephone:
(412) 648-1375
jll4@pitt.edu

/s/ Alec B. Wright
PA I.D. No. 316657
abw@obrienlawpgh.com
The Law Office of Timothy P. O'Brien

239 Fourth Avenue, Suite 2103
Pittsburgh, PA 1522


*Pro Hac Vice Pending

## VERIFICATION

The facts set forth in this Complaint are true and correct to the best of the undersigned's personal knowledge, information, and belief and are verified pursuant to 28 U.S.C. § 1746. The attorneys filing this Petition are authorized to so on my behalf.

6·9·19

_____
DATE

_____
Plaintiff, Kimberly Andrews