# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLY ANDREWS            :
                                       :

      Plaintiffs,                  :
                                         :    Case No. 2:19-cv-670-LPL

        v.                     :
                                         :

ORLANDO HARPER, Warden of Allegheny    :
County Jail; DAVID ZETWO, Chief Deputy   :
Warden; JASON BEASOM, Deputy Warden;   :
LAURA WILLIAMS, Chief Deputy Warden of   :      ELECTRONICALLY FILED
Healthcare Services; CORRECTIONAL       :
OFFICER RHODES                   :
                                         :      JURY TRIAL DEMANDED

      Defendants.

## BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER

This Complaint and Motion for Temporary Restraining Order are brought to protect the Fourteenth Amendment rights of Kimberly Andrews, a twenty-year-old pre-trial detainee with diagnoses of Bipolar Disorder and other serious mental illnesses, incarcerated at the Allegheny County Jail (ACJ) in Pittsburgh, Pennsylvania. Ms. Andrews is being held in solitary confinement, despite suffering from serious mental illness. Her conditions of solitary confinement and Defendants' deliberate indifference to her basic human need of mental health and well-being has caused her to attempt suicide on three separate occasions in less than three weeks. Each of these attempts occurred while Ms. Andrews was in solitary confinement at ACJ. Defendants continue to ignore the grave risk to Ms. Andrews' life and mental health. A Temporary Restraining Order prohibiting Defendants from continuing to keep Ms. Andrews in the harsh conditions of solitary confinement is necessary to protect her life and mental health.

The harsh conditions of solitary confinement that Ms. Andrews continues to be subjected to, coupled with her serious mental illness and decompensated mental state, led her to attempt to

take her own life on three occasions since May 21, 2019. All three attempts required Ms. Andrews to be hospitalized. On May 21, 2019, immediately prior to Ms. Andrews' first suicide attempt, Correctional Officer (C/O) Rhodes ignored requests from Ms. Andrews to contact medical staff about issues with Ms. Andrews' psychiatric medications. As Ms. Andrews began to decompensate, C/O Rhodes encouraged Ms. Andrews to commit suicide. This set off an acute psychological crisis for Ms. Andrews, and she attempted to strangle herself with torn-off strips of the mattress in her cell and a t-shirt. Ms. Andrews was then hospitalized at Allegheny General Hospital, but returned to ACJ the next day and again placed in solitary confinement.

Thereafter, on May 29, 2019, counsel for Ms. Andrews contacted counsel for the Defendants and warned of the risk to Ms. Andrews' life if Defendants continued to hold her in solitary confinement. Ms. Andrews continued to be held in solitary confinement, however, and attempted suicide again on June 1, 2019 after being found guilty of a non-violent misconduct and sentenced to 25 more days in solitary confinement. Ms. Andrews was hospitalized after attempting to strangle herself. ACJ staff failed to notice that Ms. Andrews had attempted to commit suicide for approximately one hour, by which point Ms. Andrews had begun bleeding from her nose and had lost color in her face. Counsel for Ms. Andrews again contacted counsel for Defendants about Ms. Andrews' continued placement in solitary confinement. Defendants again ignored the risk to Ms. Andrews' life and health, and continued to hold her in solitary confinement.

On Saturday, June 8, 2019, Ms. Andrews was unable to sleep in the middle of the night due to the staff on duty listening to loud music. When she asked them to turn it down she was told to "shut the fuck up." This provoked another acute mental health crisis. Ms. Andrews covered her cell window and tied a jumpsuit around her neck, fastening it to furniture in the cell, and again attempted to take her own life. She was discovered approximately 45 minutes later. Ms. Andrews

had lost consciousness and had to be resuscitated via CPR. She was taken to the hospital and released that same day.

Ms. Andrews continues to be at grave and acute risk of taking her own life. Defendants continue to hold Ms. Andrews in solitary confinement despite their knowledge of this risk to Ms. Andrews' life and knowledge of the risks that solitary confinement poses for individuals with serious mental illness. As the voluminous psychiatric literature states will often happen to persons with serious mental illness, Ms. Andrews' placement and retention in solitary confinement has resulted in her being in a decompensated mental state and attempting suicide three times in less than three weeks. Defendants have displayed a shocking and repugnant degree of deliberate indifference to Ms. Andrews' life and basic human needs. A Temporary Restraining Order (TRO) is necessary to ensure Ms. Andrews' survival and ensure that Defendants no longer deprive her of basic human needs and serious medical needs.

## I.    STATEMENT OF RELEVANT FACTS

On February 8, 2019, Kimberly Andrews was taken into custody at Allegheny County Jail (ACJ) to await disposition of criminal charges for four misdemeanors and one summary offense. Complaint, ¶¶ 11-12. Since then, one misdemeanor and the summary offense were withdrawn, and Ms. Andrews pled guilty to one misdemeanor offense, for which she has served her 30-60 day sentence. *Id.* at ¶ 12. Ms. Andrews is a pretrial detainee awaiting charges on the other two misdemeanor offenses. *Id.* Allegheny County Court of Common Pleas Judge Anthony Mariani denied Ms. Andrews' release on bond. *Id.* at ¶ 13.

Ms. Andrews, who turned 20-years-old while incarcerated at ACJ on May 25, 2019, Complaint, ¶ 14, has been diagnosed with several serious psychiatric disorders. Her diagnoses

include Bipolar Disorder, Post-Traumatic Stress Disorder (PTSD), Anxiety Disorder, and Oppositional Defiance Disorder (ODD). *Id.* at ¶15. Bipolar Disorder and PTSD are associated with increased risks of suicide. *Id*. at ¶¶18, 21 (citing Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (hereafter "DSM-V"), American Psychiatric Association, p. 131, 278.

Ms. Andrews has been held in solitary confinement for more than 70 days of her brief incarceration at ACJ. Complaint, ¶ 34. Upon arriving at ACJ, Ms. Andrews was housed on Pod 5MD—the women's mental health unit—under regular observation status, where incarcerated people are permitted significant time out of their cells for meals, recreation, leisure time, showers, phone calls, and other services and activities. *Id.* at ¶ 38.

On February 28, 2019, Ms. Andrews was placed in solitary confinement in the Restricted Housing Unit (RHU). *Id.* at ¶ 39. Although Ms. Andrews was placed in the RHU due to a disciplinary misconduct, she was not provided notice of the misconduct charges or a hearing for 11 days. *Id*. at ¶ 44. At the hearing, she was found guilty of two misconducts and sentenced to 50 days in the RHU. *Id.*

While in the RHU, Ms. Andrews was confined to a small, approximately 10' x 7' concrete cell for at least 23 hours per day, where she was deprived of soap, toothpaste, a toothbrush, pen or pencil, and all other property except for one book and some pieces of paper. Complaint, ¶ 45-48. She was denied all phone calls and visits. *Id.* at ¶ 49. During weekdays, Ms. Andrews was permitted out of her cell to spend one hour per day alone in an enclosed cage where she was permitted to exercise. The cage had no exercise or athletic equipment. *Id.* at ¶ 46. Ms. Andrews' mental health deteriorated in the RHU. She suffered severely increased anxiety, depression, inability to concentrate, obsessive thoughts, and struggled with impulses to commit suicide. *Id.* at ¶ 50-51.

After her release from the RHU to general population and regular observation status on or about April 18, 2019, Ms. Andrews' mental health improved. *Id.* at ¶ 52-53. Her adjustment to her incarceration improved and she obtained a job as a block worker, cleaning cells in the unit, painting walls on the pod, passing out trays, and other tasks. With her job as a block worker, Ms. Andrews spent the majority of her day outside of her cell. *Id.* at 54.

Ms. Andrews was again placed in solitary confinement on RHU status on or about May 7, 2019, after receiving a misconduct charge following a verbal disagreement with another incarcerated person. *Id.* at 57. She was subsequently charged with getting into a physical altercation and/or inciting a riot, for which she was eventually found not guilty at a misconduct hearing. *Id.* at ¶ 55. Ms. Andrews was subjected to the same harsh conditions and deprivations as her first stint in the RHU, and her mental health again deteriorated substantially. *Id.* at ¶ 58-59.

On May 20, 2019, Ms. Andrews returned to her cell after showering and found several pills on her desk. *Id.* at ¶ 60. Ms. Andrews was prescribed several psychiatric medications, but knew that this was not the proper protocol for dispensing medications and was unsure whether the pills she found in her cell were her prescribed medications. *Id.* Ms. Andrews informed a Correctional Officer (C/O) of her concerns regarding her medications, but the officer told Ms. Andrews that she would not contact the medical department. *Id.* at ¶ 61. Ms. Andrews did not take the pills that she found in her cell. She began to decompensate further without her prescribed medications. *Id.* at ¶ 62. The next day, on May 21, Ms. Andrews felt the onset of a mental health crisis and contacted C/O Rhodes to request the intervention of mental health staff. *Id.* at 62.

C/O Rhodes ignored Ms. Andrews' request and told her "I don't give a fuck" and "stop pushing the button," referring to the intercom system used by incarcerated people to contact staff. *Id.* at ¶ 63. Ms. Andrews complained about C/O Rhodes to Sergeant Lee, who addressed the issue

with C/O Rhodes. *Id.* Ms. Andrews' continued to decompensate and covered her cell window, urging staff to respond to her requests for medical and mental health treatment. *Id.* at ¶ 65. C/O Rhodes stopped in front of Ms. Andrews' cell. Rather than attempting to intervene or contact mental health staff to intervene, C/O Rhodes told Ms. Andrews "I don't care that you talked to the Sergeant, you can go kill yourself, I will still run this pod." *Id.*

Already in the throes of a deteriorated mental state, C/O Rhodes' indifference to Ms. Andrews' requests for help and malicious encouragement for Ms. Andrews to take her own life provoked an acute psychiatric crisis for Ms. Andrews. *Id.* at ¶ 66. Ms. Andrews tore off strips of fabric from the mattress and her t-shirt in her RHU cell and wrapped them around her neck in an attempt to strangle herself. *Id.* She was not discovered for about 45 minutes, and eventually lost consciousness. *Id.*

Ms. Andrews survived and was taken to Allegheny General Hospital for treatment. *Id.* at ¶ 68. After spending the night in the hospital, Ms. Andrews' mental health condition had stabilized and she no longer felt suicidal ideation. *Id.* at ¶ 69. On May 22, 2019 she was returned to ACJ. After she returned to ACJ, she was placed in a holding cell in the intake department and she informed staff that she was not feeling suicidal. *Id.* However, staff told Ms. Andrews that she was going to be placed in a Psychiatric Observation Cell (POC) and given only an anti-suicide smock to wear. *Id.* at 70.

Conditions in the POC are even harsher than those in the RHU. People in the POC cell are stripped of all clothing and issued a coarse and thin anti-suicide smock, and they can be seen by anybody on the unit as the cell has a glass window that allows total observation. *Id.* at ¶ 70-71. Ms. Andrews objected to being given an anti-suicide smock and being placed in the POC due to her improved psychological condition, the harsh conditions of the POC, and the fact that the POC

cell has a transparent glass wall which enables any staff, including male staff, to watch her in her cell with very little cover for her body. *Id.* at 71-72. In response to her objections, staff attacked Ms. Andrews with pepper spray while she was sitting on her bed in the intake holding cell. *Id.* at ¶ 72. Staff then forcibly removed Ms. Andrews from the cell and placed her in a "restraint chair" in another cell. *Id.* at ¶ 74. Staff fastened straps around each shoulder, her waist, both wrists, and both feet and Ms. Andrews was rendered completely immobile. *Id.* She remained in the restraint chair for six consecutive hours without food or water, an opportunity to relieve herself, or any ability to move or exercise her limbs. *Id.* at 75.

After she was removed from the restraint chair, on May 22, Ms. Andrews was returned to Pod 5MD on RHU status. *Id.* at 76. Conditions imposed on Ms. Andrews on 5MD while on RHU status are even worse than those in the RHU. In addition to the solitary confinement conditions imposed on people in the RHU, women on RHU status in Pod 5MD—the mental health unit—are not given any opportunity to exercise. Rather, when those on RHU status in the mental health unit are permitted to leave their cells for one hour during the day, they are shackled to a table in the day room without the ability to move. *Id.* at ¶ 77-78.

On May 29, 2019, counsel for Ms. Andrews sent a letter to counsel for Defendants, informing them of Ms. Andrews' suicide attempt, the continued risk posed by her remaining in solitary confinement, the widely-recognized risks of holding individuals with serious psychiatric conditions in solitary confinement, the actions of C/O Rhodes prior to Ms. Andrews' suicide attempt, and other related issues. The letter demanded Ms. Andrews' release from solitary confinement *See* Complaint, *Exhibit A*. Defendants failed to take any action in response to these warnings and displayed a complete disregard for Ms. Andrews' basic human needs and risks to her life. *Verified Complaint* at ¶ 83.

On or about Friday, May 31, 2019[1], more than three weeks after being placed in the RHU for receiving a misconduct charge, Ms. Andrews received a misconduct hearing. She was found not guilty of the physical altercation/inciting a riot misconduct, but found guilty of the misconduct alleging that she threatened to spit on C/O Rhodes. She was sentenced to 25 days in the RHU. *Id.* at ¶ 88

Later that day, faced with the prospect of additional time in solitary confinement, Ms. Andrews decompensated rapidly. She ripped her shirt into strips and again attempted to strangle herself. *Id.* at 89. Staff failed to notice Ms. Andrews' attempt to take her life for approximately one hour, despite conducting two rounds on the unit to distribute meals and medication. *Id.* at ¶ 91. By the time Ms. Andrews was discovered, she was bleeding from her nose and was losing color in her face. *Id.* Ms. Andrews was again taken to Allegheny General Hospital. *Id.* at 92.

When Ms. Andrews returned to ACJ after her hospitalization the next day, she was escorted to the intake area and had a verbal altercation with staff. Sergeant Tucker eventually pushed Ms. Andrews, discharged a taser into her back, and several other staff piled onto Ms. Andrews, causing her to lose consciousness. *Id.* at ¶ 93-94.

When Ms. Andrews regained consciousness, she was again in the restraint chair. Ms. Andrews spent 8 consecutive hours in the restraint chair, strapped in so tight that it caused bruising around her wrists and shoulder areas. She was again deprived food, water, bathroom breaks, or any ability to move her limbs. *Id.* at ¶ 94-95. When she was removed from the restraint chair, she was again placed in solitary confinement on Pod 5MD on RHU status. *Id.* at ¶ 96.

---

[1] In Plaintiff's Verified Complaint, ¶ 88 mistakenly marks the date as Friday, June 1, 2019. However, Friday in fact fell on May 31, 2019.

Ms. Andrews attempted suicide yet again approximately one week later. On the night of June 7, 2019, Ms. Andrews rang the intercom to ask that staff on the pod turn down the music they were listening to so people could sleep. *Id.* at 97. She was told by a Correctional Officer to "shut the fuck up." *Id.* Ms. Andrews proceeded to cover her cell window and use a jumpsuit to fashion a noose, tied the noose to furniture, and attempted to kill herself again. *Id.* at 98.Ms. Andrews lost consciousness before she was revived and again taken to the hospital. *Id.* at 99.

Ms. Andrews remains in solitary confinement as of the filing of this complaint and motion for TRO. She remains at grave risk of further decompensation and suicide.

Defendants Harper Zetwo, Beasom, and Williams are responsible for the overall operation of the jail, including housing and classification policy and decisions, disciplinary matters, and the provision of medical and mental health care. *Id.* at 107. Each of these Defendants are aware of the risks to Ms. Andrews' basic human needs if she remains in solitary confinement. In addition to being specifically notified by counsel for Ms. Andrews, the risks of holding an individual such as Ms. Andrews with serious mental illness in solitary confinement are obvious. Solitary confinement is characterized by isolating conditions, lack of social interaction, deprivations of hygiene items, reading materials or other mentally-stimulating items, lack of exercise, no phone calls or visits**.** Such conditions have an especially acute and deleterious effect on individuals who are already vulnerable due to mental illness.

In addition to these risks being obvious to a layperson, there is a consensus across professional and academic fields that the conditions of solitary confinement pose a substantial and unjustifiable risk of decompensation, suicide, and negative mental health effects on those with serious mental illness. This is widely recognized among psychologists and correctional officials. Defendants are practitioners in corrections and are therefore aware of this consensus.

Defendants were also made aware of the risks to Ms. Andrews mental health and suicide when they were notified by counsel for Ms. Andrews on multiple occasions.

C/O Rhodes deliberately ignored requests from Ms. Andrews to intervene in Ms. Andrews' attempts to obtain mental health care. C/O Rhodes refused to contact mental health staff when Ms. Andrews informed her of the onset of a mental health crisis. In addition to this callous indifference to Ms. Andrews' deteriorating mental state, C/O Rhodes displayed unconscionable maliciousness in encouraging Ms. Andrews to commit suicide while Ms. Andrews was decompensating.

## II.     STANDARD OF REVIEW

For a party to succeed on a motion for a temporary restraining order, it must demonstrate four factors: (1) a reasonable probability of its success on the merits; (2) that irreparable injury will result if the injunction is denied; (3) that preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *KOS Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997).

## III.     LEGAL ARGUMENT

### A. COUNT I – Plaintiff' Solitary Confinement Violates the Fourteenth Amendment to the U.S. Constitution

#### i.     Ms. Andrews will likely succeed on the merits

Pretrial detainees "retain at least those constitutional rights that...are enjoyed by convicted prisoners." *Bell v. Wolfish,* 441 U.S. 520, 545 (1979). Governments are required "to provide for [the] basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" for those they take into custody and deprive of their liberty. *DeShaney v. Winnebago County Dept. of*

*Social services,* 489 U.S. 189, 199-200 (1989). Failure to provide for basic human needs "transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides protections "at least as great as the Eighth Amendment protections available to convicted prisoners." *Boring v. Kozakiewicz,* 833 F.2d 468, 472 (3d Cir. 1987) (internal quotations omitted); *Reynolds v. Wagner,* 128 F.3d 166, 173 (3d Cir. 1997).

Prison and jail officials violate the constitution when they are deliberately indifferent to conditions of confinement that deprive an inmate of a basic human need. The Eighth Amendment's prohibition on cruel and unusual punishment is violated when both an objective and subjective requirement are met. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong requires that an injury be "sufficiently serious," *Wilson v. Seiter,* 501 U.S. 294, 298 (1991), resulting in the deprivation of a single, identifiable human need such as health, safety, food, warmth or exercise. *Id*. at 304. A condition that does not meet the objective requirement by itself may be considered in combination with other conditions if these produce a "mutually reinforcing effect" that causes deprivation of a single, identifiable human need. *Id*. The subjective prong requires that a plaintiff prove that defendants acted deliberate indifference to prisoner health or safety. *Farmer,* 511 U.S. at 834. Deliberate indifference is found when a prison official has knowledge that prisoners face "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Id*. at 847. As explained by the Third Circuit, "[t]he touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of the inmate." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992).

As was recently observed by the Chief Judge for the Middle District of Pennsylvania federal court, "Researchers have observed that 'psychological stressors such as isolation can be as

clinically distressing as physical torture.'" *Johnson v. Wetzel*, 209 F.Supp.3d 766, 779 (M.D.Pa. 2016) (quoting Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics,* 38 J. AM. ACAD. Psychiatry & Law 104, 104 (2010). The risks presented by solitary confinement on vulnerable individuals has led the United Nations Special Rapporteur on Torture to declare that "solitary confinement can never be lawfully imposed on certain categories of prisoners, including juveniles, pregnant or breastfeeding women, or *persons with mental disabilities*." (emphasis added) *Seeing into Solitary: A Review of the Laws and Policies of Certain Nations Regarding Solitary Confinement of Detainees,* Juan Mendez, et al., p. 3-4. 1 Ms. Andrews, who has serious mental health diagnoses, should therefore be excluded from solitary confinement. Subjecting Ms. Andrews to conditions that are known to exacerbate mental illness is grossly irresponsible, inhumane, and illegal.

Courts assessing the Constitutionality of solitary confinement regimes comparable to Ms. Andrews' current conditions at ACJ have held that these conditions are unconstitutional when imposed on mentally ill prisoners. *Madrid v. Gomez*, 889 F.Supp. 1146, 1265-66 (N.D. Cal. 1995) (inmates "at a particularly high risk for suffering" serious harm to their mental health "are not required to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief"); *Ruiz v. Johnson*, 37 F.Supp.2d 855, 907 (S.D. Tex. 1999) (Texas' solitary confinement units violated Eighth Amendment "through extreme deprivations which cause profound and obvious psychological pain and suffering," including by "exacerbating illness in those already suffering from mental infirmities"); *Jones 'El v. Berge*, 164 F.Supp.2d 1096, 1125-26 (W.D. Wis. 2001) (granting preliminary injunction ordering removal of seriously mentally ill inmates from Supermax prison); *Indiana Protection and Advocacy Services Com'n v. Commissioner, Indiana Dept. of Corrections*, 2012 WL 6738517, *23 (S.D. Ind. 2012)

(isolation of and lack of mental health care for mentally ill prisoners in solitary confinement units violated Eighth Amendment; See also *Casey v. Lewis*, 834 F.Supp. 1477, 1549-50 (D. Ariz. 1993) (continued placing of mentally ill prisoners in isolation despite knowledge that their mental health needs were not met resulting in harm violated Eighth Amendment); *Community Legal Aid Society v. Coupe*, 2016 WL 1055741, *4 (D. Del. March 16, 2016) (assertion "that placing individuals with serious mental illness in solitary confinement is cruel and unusual" states a claim for relief in light of district court precedent across the country); *Easley v. Burns*, 2016 WL 3561797, *2-3 (S.D. Ohio 2016) (plaintiff's allegations that he was "mentally ill and at risk of suicide as a result of being locked in solitary confinement with no mental health care or medication" stated an Eighth Amendment claim); *Graves v. Arpaio*, 48 F.Supp. 3d 1318, 1335 (D. Ariz. 2014) ("Holding inmates with serious mental illness in prolonged isolated confinement may cause serious illness and needless suffering in violation of the Eighth Amendment."); *Sardakowski v. Clements*, 2013 WL 3296569, *8 (D. Col. 2013) (allegations that isolation exacerbated prisoner's mental illness and that defendants had knowledge of this adequately stated an Eighth Amendment conditions of confinement claim); *Terry v. Rice*, 2003 U.S. Dist. LEXIS 6759, *45-46 (S.D. Ill. 2003) (placing a mentally ill and potentially suicidal prisoner in isolation could amount to deliberate indifference); *Langley v. Coughlin*, 715 F.Supp. 522, 540 (S.D.N.Y. 1989) (defendants' failure to screen out prisoners whose mental illness would be exacerbated by solitary confinement could amount to deliberate indifference).

The Third Circuit has recognized that solitary confinement conditions such as those to which Ms. Andrews is currently subjected "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir.

2017); *see also Williams*, 848 F.3d at 566 ("[T]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."). Furthermore, the *Palakovic* court recognized the high rates of suicide and self-mutilation among those subjected to solitary confinement. *Palakovic*, 854 F.3d at 226.

The risks posed by solitary confinement on individuals with serious mental illness are manifested in Ms. Andrews' continued confinement in these conditions. Ms. Andrews has several serious mental illness diagnoses, including Bipolar Disorder, PTSD, and Anxiety Disorder. Individuals with Bipolar Disorder are estimated to have at least 15 times greater risk of suicide than that of the general population. Bipolar Disorder "may account for one-quarter of all completed suicides." DSM-V, 131. Ms. Andrews has already attempted suicide on three occasions since May 21, 2019. For Ms. Andrews, the risks posed by solitary confinement are not prospective or uncertain in nature – they have already occurred on three occasions in less than three weeks. Her continued placement in solitary confinement has already deprived her of the basic human need related to her mental illnesses and overall psychological well-being. Her continued placement in solitary confinement poses an imminent risk of depriving her of the ultimate basic human need – her life.

Defendants are subjectively aware that subjecting Ms. Andrews to solitary confinement has deprived her of basic human needs and poses a substantial and unjustifiable risk of leading to her taking her own life. Defendants were made aware on multiple occasions of the specific risks to Ms. Andrews' life and mental health—and the actual harms that have already occurred—if she remained in solitary confinement. After Ms. Andrews' counsel informed Defendants of the risks solitary confinement posed to Ms. Andrew following her first suicide attempt, yet they did nothing. Ms. Andrews attempted to take her life again. Counsel for Ms. Andrews again warned Defendants

of the risk to Ms. Andrews' life and mental health, and again they did nothing. Ms. Andrews attempted to take her life once again, and Defendants still insist on holding her in solitary confinement. Ms. Andrews has attempted suicide on three occasions within less than three weeks. Defendants' continued indifference to the severe and life-threatening risks that solitary confinement poses to Ms. Andrews cannot withstand constitutional scrutiny.

Defendants are aware of the risks that prisoners such as Ms. Andrews who have serious mental illness will suffer severe harm in solitary confinement, as those risks are obvious and well-known. *See e.g., Shoatz v. Wetzel*, No. 2:13-cv-0657, 2016 WL 595337, at *9 (W.D. Pa. Feb. 12, 2016) (noting it should not strike anyone "as rocket science" that solitary substantially increases the risk of mental illness). Moreover, they clearly know of the risk to Ms. Andrews after she first attempted suicide while in solitary.

The potential for solitary confinement to cause severe harm to those suffering those conditions is recognized across various professional and academic fields. First, the condemnation of the practice by correctional experts is well-documented. For example, the Association of State Correctional Administrators ("ASCA") has acknowledged the harm caused by solitary confinement and noted that "[c]orrectional leaders across the country are committed to reducing the number of people in restrictive housing and altering what it means to be there." Press Release, ASCA, New Report on Prisoners in Admin. Segregation Prepared by the [ASCA] and the Arthur Liman Pub. Interest Program at Yale Law Sch. (Sept. 2, 2015); *see also Braggs v. Dunn,* 257 F.Supp.3d 1171, 1246 (M.D. Ala. 2017) (noting that witnesses for both plaintiffs and corrections' defendants agreed "that placing seriously mentally ill prisoners in segregation amounts to denial of minimal care"). In fact, the American Correctional Association, which accredits prison systems nationwide, has a published standard providing that generally, "an

individual diagnosed with serious mental illness will not be placed in extended restricted housing." (defined as over 30 days) American Correctional Association, Restricted Housing Expected Practices at p 37 (citing ACA Standard 4- RH-0031) (available at: http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/Restrictive_Housing_Committee/ACA_Member/Standards_and_Accreditation/Restrictive_Housing_Committee/Restrictive_Housing_Committee.aspx?hkey=458418a3-8c6c-48bb-93e2-b1fcbca482a2).

The Pennsylvania Department of Corrections automatically excludes people with serious mental illness such as Ms. Andrews from solitary confinement. *See* "The Pennsylvania prison system will stop putting mentally ill inmates in solitary," Mark Berman, Washington Post, January 8, 2015; "No Safe Harbor, Part II: Prisons cope with mental health," Rich Lord and Joe Smydo, Pittsburgh Post-Gazette, Feb. 7, 2016. Other states and jurisdictions are also precluding people with serious mental illness from solitary confinement. *See e.g.* Leon Digard, et. al., *Rethinking Restrictive Housing*, 38 Vera Institute of Justice (May 2018) (noting that North Carolina, New York City, and Nebraska have implemented programs diverting people with serious mental illness from solitary confinement); Oregon Department of Corrections & Disability Rights Oregon, *Oregon DOC will reduce isolation and improve care in the BHU*, Joint Press Release (January 13, 2016) (describing agreement to reduce isolation and improve mental health treatment for prisoners with serious mental illnesses) (available at: https://droregon.org/2244-2/); Editorial Board, *Indiana takes a step forward on solitary confinement,* The Washington Post (January 28, 2016); Jennifer Brown, *Colorado stops putting mentally ill prisoners in solitary confinement,* The Denver Post (December 12, 2013); Andy Mannix, *Solitary confinement reforms poised to pass Legislature,* Minneapolis Star Tribune

(May 22, 2019). As the Third Circuit noted in *Palakovic,* a "robust body of legal and scientific authority recogniz[es] the devastating mental health consequences caused by longterm isolation in solitary confinement." *Palakovic*, 854 F.3d at 225. An Alabama District Court aptly summarized the widespread consensus around imposing solitary confinement on people with serious mental illness:

> Given the consensus on the substantial risk of harm of decompensation for these mostly severely mentally ill prisoners, the court concludes that it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances; even in extenuating circumstances, decisions regarding the placement should be with the involvement and approval of appropriate mental-health staff, and the prisoners should be moved out of segregation as soon as possible and have access to treatment and monitoring in the meantime.

*Braggs,* 257 F.Supp.3d at 1247.

Further, the hazards of solitary confinement have long been a frequent topic of discussion in the mainstream press. E.g., Ifer Warren, *A Modern-Day Dungeon?,* Los Angeles Times, Sept. 7, 1993; Julia Cass, *For Worst Inmates, 'Supermax' Hard Time*, Philadelphia Inquirer, July 25, 1994; Sean Murphy, *Walpole Inmates Challenge Isolation, Lawsuits Claim Facility Inhumane,* Boston Globe, Sept. 5, 1994; John Gonzalez, *Prison Expert: State's Solitary Cells Inhumane*, Houston Chronicle, Feb. 5, 1999; Ralph Ranalli; *Foes Say The Practice Is Unjust And May Lead To Mental Injury For Some Detainees,* Boston Globe, Oct. 29, 2000; Kevin Johnson, *After Years In Solitary, Freedom Hard To Grasp. Ex-cons Face Long Odds On Release From Isolation*, USA Today, June 09, 2005; Abigail Curtis, *Is Solitary Confinement Torture: Proposed Bill Would Place Limits On Use Of Solitary Confinement In State Prison,* McClatchy, Oct. 24, 2009; *Atul Gawande, Hellhole: The United States Holds Tens of Thousands of Inmates in Long-term Solitary Confinement. Is This Torture?,* The New Yorker, Mar. 30, 2009; Rick Raemisch, *My Night in Solitary,* Opinion, N.Y. Times, Feb. 20, 2014; Rich Lord, *More Work To Be Done; Feds Close*

*Review Of Pennsylvania's Use Of Solitary Confinement*, Pittsburgh Post-Gazette, Apr. 15, 2016;

Nadia Kounang, *Justice Department: Federal inmates sometimes in isolation for years*, CNN, July

13, 2017; *Solitary: Life Inside Red Onion State Prison,* HBO (2017).

      Mainstream press have also frequently noted the particular risks to and harms suffered by

people with serious mental illness. *See e.g.* Sari Horwitz, *Federal prisons keeping mentally ill in*

*solitary confinement for long stretches of time, new report says,* The Washington Post (July 12,

2017); Paul Willis, *Mentally Ill Prisoners Are Destroyed By Solitary Confinement,* VICE

(February 2, 2016); Associated Press, *Rikers Island jail criticized for keeping mentally ill*

*inmates in solitary,* The Guardian (November 6, 2013); Editorial Board, *Indiana takes a step*

*forward on solitary confinement,* The Washington Post (January 28, 2016); Jennifer Brown,

*Colorado stops putting mentally ill prisoners in solitary confinement,* The Denver Post

(December 12, 2013); Ed Pilkington, *More than 4,000 mentally ill inmates held in solitary in US*

*– report,* The Guardian (October 10, 2018) (available at: https://www.theguardian.com/us-

news/2018/oct/10/mental-health-inmates-solitary-confinement-us-prisons); Christie Thompson,

et. al., *Mentally Ill and Languishing in Jail,* The Marshall Project (June 6, 2019) (available at:

https://www.themarshallproject.org/2019/06/06/mentally-ill-and-languishing-in-jail);  Andy

Mannix, *Solitary confinement reforms poised to pass Legislature,* Minneapolis Star Tribune

(May 22, 2019); Terry A. Kupers M.D., *The Harm of Solitary Confinement,* Psychology Today

(July 12, 2017) (available at: https://www.psychologytoday.com/us/blog/prisons-and-

prisms/201707/the-harm-solitary-confinement); *Illinois settles class-action suit on mentally ill*

*inmates,* Chicago Tribune (December 24, 2015).

      In light of the human need to interact with others and the widespread recognition that

solitary confinement presents imminent and extreme risks to people with serious mental illness

and who are at a high risk for suicide, no competent corrections official could remain oblivious to the risk posed by its imposition on people with serious mental illness. Defendants' continued refusal to take any action to remedy the risk posed to Ms. Andrews by solitary confinement demonstrates deliberate indifference to her conditions of confinement in violation of the 14th Amendment.

### ii. Ms. Andrews will suffer irreparable injury if she is not removed from solitary confinement

Ms. Andrews will undoubtedly suffer irreparable injury if she remains in solitary confinement. Ms. Andrews has a substantial and grave risk of further psychological decompensation and potential for suicide if she remains in solitary confinement. The harm to her mental well-being is ongoing and continuous. As has been recognized by the numerous courts discussed *supra*, the effects of solitary confinement on an individual's mental health, particularly an individual with serious mental illness, can be severe and enduring. The Seventh Circuit has recognized that the prospect of a prisoner engaging in acts of self-harm caused by their conditions of confinement constitutes an "imminent physical injury" for purposes of granting an *in forma pauperis* petition:

> When the prospect of self-harm is a consequence of the condition that prompted the suit, a court should treat the allegation (if true) as imminent physical injury. And this is the kind of allegation Sanders has advanced. He contends that solitary confinement not only is injurious by itself but also causes prisoners to lose the benefit of mental-health care, and that only self-mutilation (or a credible threat of self-mutilation) restores that care.

*Sanders v. Melvin,* 873 F.3d 957, 961 (7th Cir. 2017).

Ms. Andrews has already suffered some of these severe effects and they are exacerbated with each moment that she remains confined in these conditions. Ms. Andrews has already survived three attempts to take her own life. The prospect of her attempting to take her life again

if she remains in solitary confinement is imminent and the risk that she should succeed in doing so is unjustifiable.

### iii. Defendants will not be harmed by Ms. Andrews' removal from solitary confinement

If Ms. Andrews is removed from solitary confinement Defendants will not be harmed. First, Defendants cannot claim to be harmed by complying with Constitutional requirements. The unconstitutionality of holding individuals with serious mental illness in solitary confinement is beyond dispute.

The reasons for holding Ms. Andrews in solitary confinement are not persuasive, nor of great importance to jail officials' administration of the prison. The misconduct for which Ms. Andrews remains on RHU status does not mandate a 25-day RHU confinement. The misconduct was verbal in nature, and did not involve any harm to a person. Nor does Ms. Andrews appear to present any future threat to the safety and security of others if she was released from solitary confinement.

Even if Defendants can demonstrate that they will suffer some harm, it cannot overcome the harm that Ms. Andrews will suffer if she remains in solitary confinement. The risk that she will lose her life if she remains there is substantial and unjustifiable. So, too, is the risk of further severe and enduring deleterious effects on her mental health. Whatever harm Defendants may be able to proffer if a TRO is granted, it cannot trump the potential harm to Ms. Andrews that she will no longer be alive to litigate her claims against them.

### iv. Public interest favors protecting individuals from risk of suicide and indifference to deprivation of basic human needs

Public interest in this case inures significantly to the benefit of Ms. Andrews. The public

should expect and demand that jail officials incarcerate members of the community in

conformity with constitutional requirements. Defendants here have fallen woefully short of that

duty.

Furthermore, Ms. Andrews life and mental health are at stake in considering whether to

grant a TRO. The public interest in ensuring that incarcerated community members have their

mental health needs met and cared for is substantial. We should not expect nor accept that

individuals who are being held as pretrial detainees, for which they have not yet been convicted

of any crime, will be subjected to conditions so harsh that they will be at risk for taking their own

lives or decompensating.

**B. COUNT II – Defendant Rhodes' Conduct Violates the Fourteenth Amendment to the U.S. Constitution**

**i. Ms. Andrews will likely succeed on the merits**

Plaintiff will likely succeed on the merits in her claim against Correctional Officer

Rhodes. Plaintiffs asserting Fourteenth Amendment claims against jail staff or officials for denial

of medical needs must demonstrate "(i) a serious medical need, and (ii) acts or omissions [by the

Defendant] that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr.

Facility,* 318 F.3d 575, 582 (3d Cir. 2003).

A medical need is "serious" if it is "one that has been diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would easily recognize the

necessity for a doctor's attention." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326,

347 (3d Cir. 1987). A Defendant demonstrates deliberate indifference to a serious medical need

by recklessly disregarding a risk of serious harm. *Farmer,* 511 U.S. at 836. Jail staff may not "deny reasonable requests for medical treatment when such denial exposes the inmate to undue suffering or the threat of tangible residual injury." *Palakovic,* 854 F.3d at 228 (internal quotations and alterations omitted). Jail staff with "knowledge of the need for medical care" may not "intentional[ly] refus[e] to provide that care." *Id.*

Ms. Andrews has several serious diagnoses of mental illness for which she was prescribed psychiatric medications. She is diagnosed with Bipolar Disorder, PTSD, Anxiety Disorder, and ODD. Additionally, during her interactions with Defendant Rhodes, Ms. Andrews was in a mental health crisis and had contacted Defendant Rhodes' supervising officer in an attempt to get an adequate response from Defendant Rhodes. Defendant Rhodes denied Ms. Andrews request to contact the medical department about issues Ms. Andrews was having with her medications for no apparent reason, and certainly no reason justified by medical or security concerns. C/O Rhodes also deprived Ms. Andrews of medical care by refusing Ms. Andrews' request to be treated by mental health staff when she felt the onset of a mental health crisis. Defendant Rhodes knew that Ms. Andrews required medical care, and intentionally refused to attempt to contact medical professionals who could provide care to Ms. Andrews. Most shockingly, C/O Rhodes crossed the line from refusing Ms. Andrews' requests for treatment for her serious mental illnesses to actively creating an acute mental health crisis when C/O Rhodes encouraged her to commit suicide.

C/O Rhodes also had subjective awareness that she was depriving Ms. Andrews of serious medical needs. C/O Rhodes knew that Ms. Andrews was prescribed psychiatric medications and that depriving her of access to medical staff could lead to negative affects of Ms. Andrews not taking her medications. C/O Rhodes knew that Ms. Andrews was in the midst

of a mental health crisis and refused to contact mental health staff on her behalf. C/O Rhodes went beyond mere deliberate indifference in encouraging Ms. Andrews to take her own life. This act does not merely violate the Fourteenth Amendment, but is in fact a criminal act in Pennsylvania. *See* 18 Pa. C.S. §2505(b).[2]

### ii. Ms. Andrews will suffer irreparable injury if she is not separated from Defendant Rhodes

As is discussed in greater detail *supra* Ms. Andrews is in a decompensated psychological state and is at serious risk of suicide and further decompensation. C/O Rhodes has not only displayed a callous and indefensible disregard for Ms. Andrews' mental health and risk of committing suicide, but has also actively encouraged Ms. Andrews to take her own life. C/O Rhodes' acts in telling Ms. Andrews to commit suicide precipitated an acute crisis for Ms. Andrews, which led her to in fact attempt to take her own life. Defendant Rhodes has demonstrated an inability to conduct herself in a manner comporting with the U.S. Constitution and presents a grave risk of further harming Ms. Andrews. Ms. Andrews, who suffers from Post-Traumatic Stress Disorder, is at severe risk of further decompensation and attempts to take her own life with any further interaction between her and Defendant Rhodes.

### iii. Any harm suffered by Defendant Rhodes is negligible and cannot be greater than the harm that will be suffered by Ms. Andrews if no separation is ordered

Ms. Andrews' mental health is at risk if there is any further contact or interaction between her and C/O Rhodes. The harm caused by Defendant Rhodes and suffered by Ms. Andrews was substantial and life-threatening, and the risk of such harm recurring if the Defendant exercises a position of authority over her is substantial. By comparison, any harm

---

[2] 18 Pa. C.S. § 2505(b) provides: A person who intentionally aids or solicits another to commit suicide is guilty of a felony of the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a misdemeanor of the second degree.

Defendant Rhodes will incur is negligible and trivial. At most, Defendant Rhodes will not be permitted to work in proximity to Ms. Andrews. Defendant Rhodes will still be permitted to maintain her employment under an order requiring her separation from Ms. Andrews.

### iv. Public interest favors granting a separation between Defendant Rhodes and Ms. Andrews

Defendant Rhodes, similar to ACJ officials, is entrusted with the care and custody of people incarcerated at ACJ. She is a public employee hired to perform a public function in a professional manner and in conformity with the constitution. Her actions in ignoring Ms. Andrews' serious mental health needs and in provoking Ms. Andrews to attempt suicide are a flagrant violation of her duties. The public has a substantial interest in ensuring that incarcerated community members are treated with dignity and respect. Defendant Rhodes has demonstrated an utter inability to comport herself with this very basic expectation when interacting with Ms. Andrews. The public also has a substantial interest in ensuring that incarcerated people are not actively encouraged to commit suicide by those employed to oversee their care and custody. Ordering a separation between Defendant Rhodes and Ms. Andrews will permit Ms. Andrews to be free from continued degrading and abusive treatment from Defendant Rhodes.

## IV. CONCLUSION

Plaintiff respectfully requests this court grant her motion for a Temporary Restraining Order. Respectfully

/s/ Bret Grote
Legal Director
PA I.D. No. 317273
bretgrote@abolitionistlawcenter.org
/s/ Quinn Cozzens
Staff Attorney

PA I.D. No. 323353
qcozzens@alcenter.org
/s/ Swain Uber, of counsel*
swain.uber@gmail.com
PA I.D. No. 323477
Abolitionist Law Center
PO Box 8654
Pittsburgh, PA 15221
412-654-9070

/s/ Jules Lobel
Jules Lobel*
N.Y. Bar No. 1262732
3900 Forbes Avenue
Pittsburgh, PA 15260
Telephone: (412) 648-1375
jll4@pitt.edu

/s/ Alec B. Wright
PA I.D. No 316657
The Law Office of Timothy P. O'Brien
239 Fourth Avenue, Suite 2103
Pittsburgh, PA 15222
Phone: (412) 232-4400
Email: abw@obrienlawpgh.com


*Pro Hac Vice Pending

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing Brief in Support of Plaintiff's Motion for a Temporary Restraining Order upon the following person in the manner indicated below:

<u>Service Via email</u>

John Bacharach Esquire
Counsel for Allegheny County and Defendants

<u>*s/ Bret D. Grote*</u>
Bret D. Grote
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221

Dated: June 10, 2019