### IN THE UNITED STATES DISTRICT COURT

### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLY ANDREWS : 
 :
   Plaintiffs, : Case No. 2:19-cv-00670-CCW
 :
   v. :
 :
ALLEGHENY COUNTY; ORLANDO : 
HARPER, Warden of Allegheny County Jail; : **ELECTRONICALLY FILED**
DAVID ZETWO, Chief Deputy Warden; :
JASON BEASOM, Deputy Warden; LAURA :
WILLIAMS, Chief Deputy Warden of : **JURY TRIAL DEMANDED**
Healthcare Services; MICHAEL BARFIELD, :
Mental Health Director; CHARLES :
MCGLYNN, Psychiatrist; FRANK, Captain; :
ALYSSIA TUCKER, Sergeant;
CHRISTOPHER RADACI, Sergeant; MARK
FALCONE, Sergeant; Captain KENNETH
WISEMAN

   **Defendants.**


### Amended Complaint

Plaintiff Kimberly Andrews, by and through her undersigned counsel, files the following

Third Amended Complaint.

### Introduction

Kimberly Andrews, a twenty-year-old who suffers from the serious psychiatric disabilities of

Bipoloar Disorder, Post-Traumatic Stress Disorder, and Borderline Personality Disorderd, survived

4 suicide attempts during the more than 130 days of solitary confinement she endured at the

Allegheny County Jail ("ACJ") between February and November 2019. Despite robust case law and

a consensus that has emerged among mental health, correctional, and human rights experts that

individuals who, like Ms. Andrews, suffer from serious mental health conditions should be

precluded from solitary confinement due to the severe risk caused by even short periods of isolation, Defendants persisted in holding Plaintiff in these deadly conditions.

Ms. Andrews' solitary confinement has been further compounded by deficient provision of mental health care at ACJ. Deficient to non-existent diagnostic processes, a total lack of confidentiality for patient interactions with mental health staff when in solitary confinement, medication mismanagement, failure to respond to requests for assistance, the lack of *any* counseling or therapy, failure to conduct meaningful assessments after suicide attempts:, and a culture among staff of verbal abuse and excessive force that have caused Plaintiff severe psychological and emotional pain, suffering, decompensation, and brought her to the brink of death on multiple occasions.

Defendants imposition of solitary confinement upon Ms. Andrews, their failure to provide necessary mental health care, and their repeated instances of excessive force violated her constitutional rights and discriminated against her on the basis of her psychiatric disability in violation of federal law.

**Jurisdiction and Venue**

1. This case is brought pursuant to 42 U.S.C.§ 1983, 28 U.S.C. §§ 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), seeking declaratory, monetary, and injunctive relief, including a permanent injunction to prohibit the placement or retention of Kimberly Andrews in solitary confinement at the Allegheny County Jail, as such conditions are threatening to her life and health and constitute discrimination on the basis of disability.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

3. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

**Parties**

4.      Plaintiff Kimberly Andrews is twenty-years-old and was held as a pretrial detainee at the ACJ between February and June of 2019, and again between September and November of 2019. She spent more than 130 days in solitary confinement during these periods of incarceration. Ms. Andrews attempted suicide on four occasions while in solitary confinement, including her most recent attempt of September 21, 2019, each resulting in hospitalization. She has a history of mental illness, which is greatly exacerbated by her placement and retention in isolation.

5.      Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County is in possession and control of the ACJ.

6.      Orlando Harper is the Warden at the ACJ. Defendant Harper is sued in his individual and official capacity.

7.      David Zetwo is the Chief Deputy Warden of the ACJ. Defendant Zetwo is sued in his individual and official capacity.

8.      Jason Beasom is the Deputy Warden of the ACJ. Defendant Beasom is sued in his individual and official capacity.

9.      Laura Williams is the Chief Deputy Warden of Healthcare Services at the ACJ. Defendant Williams is sued in her individual and official capacity.

10.     Dr. Michael Barfield is the Mental Health Director at the ACJ. He is sued in his individual and official capacity.

11.     Dr. Charles McGlynn is a psychiatrist employed with Allegheny Health Network and contracted to provide psychiatric services at ACJ. He is sued in his individual and official capacity.

12.     Kenneth Wiseman is a Captain at the ACJ. He is sued in his individual and official capacity.

13.     Alyssia Tucker is a Sergeant at the ACJ. She is sued in her individual and official capacity.

14.     Stephanie Frank is a Captain at the ACJ. She is sued in her individual and official capacity.

15.     Christopher Radaci is a Sergeant at the ACJ. He is sued in his individual and official capacity.

16.     Mark Falcone is a Sergeant at the ACJ. He is sued in his individual and official capacity.

## Statement of Facts

17.     Kimberly Andrews was incarcerated at the ACJ from February 8 through June 20, and again from September 6 through November 18, 2019.

18.     During both periods of incarceration Ms. Andrews was a pretrial detainee awaiting adjudication of criminal charges or alleged probation violations.

## Unlawful Solitary Confinement of Plaintiff with Psychiatric Disabilities

19.     Ms. Andrews was subjected to more than 130 days in solitary confinement at ACJ during 2019. As a consequence, her mental health has suffered immensely, leading to four suicide attempts, each of which occurred while she was held in solitary confinement.

20.     Defendants held Ms. Andrews in solitary confinement without adequate justification. Their conduct betrayed a callous disregard for her health, her constitutional rights, and her very life.

21.     Each day Ms. Andrews remained in solitary confinement her life was in grave danger, and Defendants were made aware of this through her repeated suicide attempts, communications from her legal counsel, and court filings in this litigation.

22.     Defendants Harper, Zetwo, Beasom, and Williams are responsible for the overall operation of the ACJ, including housing and classification policy and decisions, disciplinary matters, and the provision of medical and mental health care.

23.     Defendants Harper, Zetwo, Beasom, and Williams all exercise supervisory authority over ACJ disciplinary practices, including the imposition of solitary confinement.

24.     Each of the Defendants in this action are aware that people with serious mental illness are routinely placed in RHU status, often suffering the predictable debilitating consequences to their mental health.

25.     ACJ provides for no exclusion from the RHU based on a person's serious mental illness and/or their suicide risk.

26.     Ms. Andrews has been diagnosed with numerous, serious psychiatric disorders throughout her life, including Bipolar Disorder, Post-Traumatic Stress Disorder, Borderline Personality Disorder, and Anxiety Disorder.

27.     Ms. Andrews was first diagnosed with Bipolar Disorder around the age of thirteen.

28.     Bipolar Disorder is defined by the American Psychological Association (APA) as "a serious mental illness in which common emotions become intensely and often unpredictably magnified. Individuals with bipolar disorder can quickly swing from extremes of happiness, energy and clarity to sadness, fatigue and confusion. These shifts can be so devastating that individuals may choose suicide." *See* https://www.apa.org/topics/bipolar/.

29.     "The lifetime risk of suicide in individuals with bipolar disorder is estimated to be at least 15 times that of the general population. In fact, bipolar disorder may account for one-quarter

of all completed suicides." Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, American Psychiatric Association (hereafter "DSM-V"), p. 131.

30.     Ms. Andrews was first diagnosed with Post-Traumatic Stress Disorder (PTSD) at approximately ten years old.

31.     PTSD is described by the APA as "an anxiety problem that develops in some people after extremely traumatic events," causing people with PTSD to "relive the event via intrusive memories, flashbacks and nightmares" and causing them to avoid anything reminding them of the event and having anxiety that is "so intense their lives are disrupted." *See* https://www.apa.org/topics/ptsd/index.

32.     "PTSD is associated with suicidal ideation and suicide attempts, and presence of the disorder may indicate which individuals with ideation may eventually make a suicide plan or actually attempt suicide." DSM-V, p. 278.

33.     Ms. Andrews has been diagnosed with Borderline Personality Disorder (BPD) at Western Psychiatric Institute and Clinic prior to her incarceration at ACJ. She has also been diagnosed with BPD by psychiatrists at ACJ, and by an evaluation by a psychiatrist retained by her legal counsel that was completed during her incarceration at ACJ in fall 2019.

34.     Borderline Personality Disorder is a condition marked by "a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins with early adulthood and is present in a variety of contexts." People with Borderline Personality Disorder "are very sensitive to environmental circumstances," "experience intense abandonment fears and inappropriate anger," and "display recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior." DSM-IV, p. 706-07

35.     Ms. Andrews was first diagnosed with Anxiety Disorder at approximately the age of ten.

36.     Anxiety Disorder is characterized by recurring intrusive thoughts and physical symptoms such as sweating, trembling, dizziness or a rapid heartbeat. https://www.apa.org/topics/anxiety/index. Individuals with anxiety disorder find that "[t]he intensity, duration, or frequency of the anxiety and worry is out of proportion to the actual likelihood or impact of the anticipated event. The individual finds it difficult to control the worry and to keep worrisome thoughts from interfering with attention to tasks at hand." DSM-V, p. 222.

37.     Ms. Andrews also has a history of committing acts of self-harm, including suicide attempts. The first attempt took place while she was only nine years old, and there have been additional attempts prior to her current incarceration at ACJ.

38.     Ms. Andrews' most recent suicide attempt, prior to her incarceration, took place while she was 18. In the time since that attempt, she reports she had felt stable, mentally, emotionally, and psychologically. She had found employment, exercised frequently, was receiving therapy and taking her prescribed medications. She had begun to attend church.

39.     As discussed in more detail *infra*, there now exists an obligatory consensus among psychiatric experts, correctional experts, and courts that the well-known, clearly established risks and harms of solitary confinement are so severe – potentially fatal – that individuals with serious mental illness such as Ms. Andrews are to be precluded from such conditions of confinement altogether.

40.     The Commonwealth of Pennsylvania agrees that mentally ill prisoners will not be placed and retained in solitary confinement units due to the severe risk of deterioration and serious harm that is likely to occur to such prisoners. *See* "The Pennsylvania prison system will stop putting mentally ill inmates in solitary," Mark Berman, Washington Post, January 8, 2015; "No Safe Harbor, Part II: Prisons cope with mental health," Rich Lord and Joe Smydo, Pittsburgh Post-Gazette, Feb. 7, 2016.

41.     The risks of solitary confinement for individuals with serious mental illness are so obvious and well-known in the corrections profession that Defendants cannot be unaware of these risks, as well as the recognition that people with mental illness should never be placed in such dangerous conditions.

42.     Despite the undeniable pain, suffering, and risk of acute psychological decompensation inherent when imposing solitary confinement on people with serious mental illness, not a day goes by in which defendants are not holding substantial numbers of people with serious mental illness in such torturous, suicide-inducing conditions of isolation at ACJ.

43.     While in the RHU, Ms. Andrews was forced to spend at least 23 hours of every day in a tiny concrete cell. The cell is approximately 10 X 7 feet.

44.     On the weekdays, if staff complied with policy, Ms. Andrews was let out for one hour into a cage where she could exercise alone. The cage had no exercise or athletic equipment, or anything whatsoever within it.

45.     Incarcerated people in the RHU, including Ms. Andrews, are frequently deprived of any hygiene items. At times, Ms. Andrews was not permitted soap, toothpaste, or a toothbrush while in solitary confinement.

46.     Ms. Andrews was often deprived of reading materials and any writing implement in the RHU.

47.     Ms. Andrews was denied all phone calls and visits, except legal calls, while in the RHU until the end of October 2019.

48.     Due to being placed in the RHU despite her psychiatric disabilities, Ms. Andrews was denied access to services and programs offered at ACJ, including but not limited to group recreation, congregate meals and exercise, religious services, eligibility for employment, and access to the law library.

49.     While in solitary confinement Ms. Andrews' mental health deteriorated. She suffered severely increased anxiety, depression, inability to concentrate, obsessive thoughts, and struggled with impulses to commit suicide.

50.     The symptoms Ms. Andrews experiences in solitary confinement are well-documented, predictable responses to isolation for individuals suffering from the serious psychiatric disorders Ms. Andrews has.

51.     On May 21, 2019, Ms. Andrews began to decompensate as a result of not being provided her medication according to procedure. She used the intercom to request intervention of mental health staff as she felt the onset of a mental health crisis.

52.     C/O Rhodes ignored her request, telling her "I don't give a fuck" and to "stop pushing the button." Ms. Andrews spoke with Sgt. Lee about C/O Rhodes' conduct.

53.     Ms. Andrews subsequently covered her cell window with loose papers in an attempt to elicit intervention for her mental health needs. While making rounds C/O Rhodes stopped at her cell and said, "I don't care that you talked to the Sergeant, you can go kill yourself, I will still run this pod."

54.     C/O Rhodes' words provoked Ms. Andrews, setting off an acute psychiatric crisis. Ms. Andrews tore strips off of her mattress, and along with a torn shirt, wrapped them around her neck and tried to strangle herself.

55.     At least 45 minutes had passed, including one round of security checks, before Ms. Andrews was attended to by staff. By that point, she had lost consciousness.

56.     Ms. Andrews was removed from her cell and taken to Allegheny General Hospital for treatment. She spent the night in the hospital.

57.     Following her first suicide attempt, Ms. Andrews was transferred to level 5MD, the women's mental health pod, and returned to solitary confinement on RHU status.

58.     Even though she was in a mental health pod, being on RHU status meant that she was placed in solitary confinement, in the same and in some respects even worse conditions than non-mentally ill prisoners in RHU status.

59.     In addition to the aforementioned RHU conditions of isolation set forth *infra*, on 5MD those on RHU status are deprived any exercise. When offered the opportunity to be released from their cell for an hour, instead of being allowed to go exercise in the cage, they are shackled to the table in the day room, unable to move.

60.     On May 29, 2019, counsel for Ms. Andrews sent a letter on her behalf to Warden Harper and sent it in care of an attorney for the Allegheny County Law Department, John Bacharach.

61.     The letter demanded that Ms. Andrews be released from solitary confinement, stating: "A growing consensus of courts, human rights advocates, prison officials and systems have recognized that individuals with such serious psychiatric conditions as Ms. Andrews are to be precluded from solitary confinement due to the grave risk of psychological pain, decompensation, and increased risk of suicidality associated with this type of isolation."

62.     Defendant Harper and his staff refused to take any action, displaying a brazen disregard for the Constitution and Ms. Andrews' health.

63.     On May 30, 2019, after being sentenced to additional time in solitary confinement, Ms. Andrews attempted suicide again. Ms. Andrews ripped her shirt into strips and again commenced to manually strangle herself.

64.     Ms. Andrews was again taken to Allegheny General Hospital.

65.     Ms. Andrews was returned to solitary confinement status in 5MD.

66.     On June 7, 2019, after struggling to sleep for several days, Ms. Andrews was awoken by loud music being played by two correctional officers. She requested they turn down the music.

They responded, "Shut the fuck up", calling her a "retard". In an effort to force contact with the sergeant, Ms. Andrews flooded the cell. The C/O refused to call the sergeant.

67.     Ms. Andrews then threatened suicide. The C/O entered and removed her mattress. She tore the pages out of her only book, and used the papers to cover the window. She ripped an extra uniform she had used for warmth into strips and tied a makeshift noose to the table in her cell and around her neck.

68.     Ms. Andrews lost consciousness. It was at least 15 minutes before staff attended to her. CPR was needed to revive her; the middle of her rib cage on her left side was injured and continues to hinder her movement and breathing.

69.     Ms. Andrews was again taken to Allegheny General Hospital.

70.     The imposition of such conditions of solitary confinement on a human being suffering from Bipolar Disorder, PTSD, Borderline Personality Disorder, and Anxiety Disorder, who had attempted suicide on three occasions in a span of eighteen days due to predictable episodes of decompensation is shocking, inhumane, and illegal.

71.     On June 11, 2019, Ms. Andrews filed the original Complaint initiating this lawsuit, along with a motion for a temporary restraining order (TRO).

72.     On June 12, 2019, this Court scheduled a hearing on the TRO motion. The parties negotiated a resolution that deferred Ms. Andrews' remaining RHU time and permitted her release to general population status upon her being cleared from psychiatric observation status.

73.     On June 14, 2019, Ms. Andrews was cleared from psychiatric observation status and returned to the general population. She remained on that status without incident until her release from ACJ on June 20, 2019.

74.     On June 20, 2019, Ms. Andrews was released from ACJ.

75.     On September 6, 2019, Ms. Andrews was arrested and re-incarcerated at the ACJ.

76.     Ms. Andrews was returned to level 5MD, the women's mental health unit, on or around September 7, 2019. She was eventually cleared for release from 5MD and transferred to level 4F.

77.     Almost immediately upon her arrival to 4F, Ms. Andrews encountered hostility from several guards who made disparaging and retaliatory statements to her about the lawsuit filed in this matter in June.

78.     Additionally, Ms. Andrews was only prescribed one of the three psychotropic medications that ACJ indicated she should be prescribed in their own discharge papers pertaining to Ms. Andrews from June 20, 2019. Ms. Andrews was only prescribed Abilify, an anti-psychotic.

79.     On September 10, 2019, while on 4F, Ms. Andrews was not provided her Abilify. The medical records confirm that the medication was "Not Available" for Ms. Andrews on that day.

80.     Ms. Andrews repeatedly asked to see mental health or a supervisor so she could address the lack of medication and receive necessary mental health treatment. All staff on 4F refused to contact mental health staff or a supervisor.

81.     Ms. Andrews filled out grievances about the matter. She again requested orally to see mental health staff and was told by a guard that she would not be given anything until she "apologized to everybody you fucked with the last time" she was at ACJ.

82.     This provocation led to an altercation that staff responded to with force. Ms. Andrews ended up again placed in the restraint chair for hours.

83.     Ms. Andrews was ultimately placed back in solitary confinement. She was never provided a written copy of the misconducts she was charged with.

84.     On September 19, 2019, Ms. Andrews was sentenced to 100-days RHU solitary confinement status.

85.     On September 21, 2019, Ms. Andrews again attempted to commit suicide, this time wrapping a rope she had made from her clothing around her neck. She lost consciousness and CPR had to be performed. She was taken to Allegheny General Hospital again.

86.     After her return to the ACJ she remained in the mental health unit 5MD in the glass-fronted psychiatric observation cell until her release from ACJ on November 18, 2019.

87.     Although the Parties reached a temporary agreement for the remaining several weeks of Ms. Andrews' incarceration at ACJ that permitted additional out of cell time, Ms. Andrews remained in conditions of unconstitutional isolation that were dangerous to her health and which resulted in symptoms of anxiety, depression, difficulty concentrating, insomnia, irritability, and serious risk of self-harm.

88.     ACJ did not enact any policy change to its practice of not precluding people with serious mental health conditions from placement in solitary confinement.

89.     Defendants' disciplinary practices do not give consideration to the role that an incarcerated person's psychiatric disability plays in alleged institutional misconduct.

90.     Mental health staff are not involved in the disciplinary proceedings of people who, like Ms. Andrews, have psychiatric disabilities. This results in people with psychiatric disabilities being punished for actions and reactions that are caused by their psychiatric condition.

91.     Mental health staff are not consulted as to whether people with psychiatric disabilities should be provided alternative housing from RHU status.

92.     In fact, ACJ does not have any disciplinary alternatives to accommodate people with psychiatric disabilities. Instead, Ms. Andrews and others with psychiatric disabilities are punished instead of treated and placed in conditions of isolation that all but guarantee additional disciplinary issues will occur due to the psychological decompensation caused by solitary confinement.

93.     Without court intervention Ms. Andrews will continue to be subjected to solitary confinement in the event of her re-incarceration, and disciplinary practices that fail to take into account and make a reasonable accommodation for her psychiatric disabilities.

### Excessive Use of Force

94.     Ms. Andrews was repeatedly subjected to excessive use of force at ACJ. She suffered attacks with Oleoresin Capsicum (OC) Spray (known as "pepper spray") and electro-shock Tazer weapons, and was repeatedly placed in a torturous device known as the "restraint chair" wherein she was tightly strapped around her ankles, shoulders, and wrists into a chair and left for 6-9 hours at a time without food, water, bathroom break, or any medical or mental health assessments.

95.     Use of the restraint chair at ACJ is rampant and effectively unregulated, deployed by staff who are not properly trained or supervised.

96.     Upon information and belief, hardly a day goes by in which somebody is not forcibly strapped to a chair and left to suffer for 6 or more hours.

97.     Incarcerated people are strapped to the chair for alleged non-compliance, in response to any physical altercation, or if they are in need of medical or mental health care.

98.     Staff utilize the chair as a catch-all response to any situation where they desire to assert control, even when such is not supported by an objectively reasonable security basis.

99.     In addition to the lack of proper justification for use of the chair, the manner in which it is used increases the danger to a person's health, as individuals such as Plaintiff are left in the chair for hours without medical or mental health assessments, without the opportunity to exercise their limbs, without food or water, and without even so much as the opportunity to relieve themselves.

100.     The restraint chair is also used even when such use is medically and psychiatrically contraindicated, in part because Defendants Harper, Williams, Zetwo, and Beasom fail to train staff

on how to recognize and appropriately respond to individuals with physical and psychiatric disabilities.

101.    Defendants Harper, Williams, Zetwo and Beasom are well aware of the manner in which the restraint chair is used, as they were aware when it was used against Ms. Andrews, and they acquiesce in this abuse. They authorize its use via the promulgation of policy, review of specific use of force incidents involving the restraint chair, and via it being common knowledge at ACJ the frequency and instances in which the chair is used.

*First Incident*

102.    On May 22, 2019, when Ms. Andrews returned to ACJ the day following her first suicide attempt, she was placed in a holding cell in intake. She was calm and her mental health condition had stabilized. She had spent the night in the hospital and she no longer felt suicidal ideation.

103.    Ms. Andrews informed staff she did not feel like harming herself and she objected to being told she was to be placed in an anti-suicide smock and placed in a psychiatric observation cell (POC).

104.    The anti-suicide smocks are thin and expose a person to anybody looking into their cell. Ms. Andrews also did not want to be in the POC because the cell has a glass front, and a camera, and anybody on the unit, including male staff, can watch her in the cell with little to cover her body.

105.    Because of her objection to being placed in an anti-suicide smock in the POC due to her being psychologically stable, staff informed her they were going to use force.

106.    After retrieving the smock, defendant Wiseman decided to attack her with pepper spray, firing the spray through the slot in the cell door at Ms. Andrews. She did not have access to her medically-necessary inhaler. Staff filmed the encounter; Ms. Andrews was completely naked for

the entire duration of the ordeal, as the smock she had in the cell was not working properly and she could not fasten it around herself.

107.     Defendant Wiseman did not utilize alternatives at their disposal, such as having her evaluated by a mental health professional, assessed as to her current risk of self-harm, ending her solitary confinement and permitting more out of cell time, providing counseling, or continuing to talk with her about complying with their request.

108.     Instead, he moved to the use of force without exploring any alternatives.

109.     The use of pepper spray, a respiratory irritant, on individuals suffering from asthma can result in serious, and potentially fatal, health complications.

110.     Ms. Andrews was then forcibly taken from her cell and moved to another cell that contained the restraint chair. Straps were fastened around each shoulder, her waist, both wrists, and her feet.

111.     Ms. Andrews was left in the chair for at least 5 consecutive hours without food, bathroom break, the ability to move or exercise her limbs, and not provided any medical check.

<u>*Second Incident*</u>

112.     Upon returning to ACJ after her second suicide attempt (see *supra*), on or about May 31, 2019, Ms. Andrews was being escorted by Sgt. Tucker in the intake area. Sgt. Tucker fell behind, and when questioned where she was by Ms. Andrews, Sgt. Tucker told her to "shut the fuck up." Ms. Andrews responded in kind. The two continued to argue on the way to the elevator.

113.     Sgt. Tucker then forcefully pushed Ms. Andrews into the elevator, causing her to hit her head and fall.

114.     Sgt. Tucker then fired a Tazer into her back. Following this attack, several other guards piled onto Ms. Andrews. She was then Tazed again by Tucker**.** She lost consciousness and awoke in the restraint chair.

115.     Ms. Andrews spent approximately 9 consecutive hours in the restraint chair, strapped in so tight that it caused bruising around her wrists and shoulder areas.

116.     She was again deprived food, water, bathroom breaks, or any ability to move her limbs.

117.     At one point, Ms. Andrews asked for her inhaler, but her request was denied; no other medical checks were conducted.

*Third Incident*

118.     On October 22 2019, Ms. Andrews began attempting to hang herself after an anxiety attack was improperly dealt with by correctional and medical staff on 5MD.

119.     Since Ms. Andrews was in the psychiatric observation cell, staff were able to intervene before the attempt progressed.

120.     After the incident had been interrupted and Ms. Andrews no longer had any clothing or other object around her neck or otherwise obstructing her breathing, Defendant Stephanie Frank, a captain at ACJ, ordered her clothing to be forcibly cut off of her so that she would be naked.

121.     There was no medical or security justification for the forcible removal of her clothing in front of multiple staff, many of whom were male, as well as the rest of the pod.

122.     This act was gratuitous, cruel, humiliating, and done without any consideration as to the adverse psychological impact of such violence, in particular on a person suffering from Post-Traumatic Stress Disorder such as Ms. Andrews.

123.     Following their stripping her naked, staff forced her into the restraint chair, which had been brought up to 5MD, and strapped her into the chair naked.

124.     Ms. Andrews was transported in the chair to the intake area and left there without food, water, bathroom break, or any medical or mental health assessments for several hours.

*Fourth Incident*

125.     On November 8, 2019, Ms. Andrews fell into a deep sleep while she was shackled to the table in the dayroom on 5MD.

126.     Dr. McGlynn had abruptly lowered her Ability dosage from 20 mg to 5 mg only the day before, and on November 8 he removed her from Abilify altogether and started her on Zyprexa instead.

127.     These sudden medication changes possibly caused Ms. Andrews to fall into a deep sleep at the table.

128.     Ms. Andrews was awoken to a piece of fabric or cotton, soaked in ammonia, being shoved into her face. Instinctively, still cuffed to the table, she jerked her head away and pushed the chemical-soaked material away.

129.     Ms. Andrews was eventually un-cuffed from the table. As she stood, she began to feel dizzy, so she sat on the ground. She still had her handcuffs on.

130.     Ms. Andrews began to hyperventilate. Knowing her condition—asthma—and the possibility of it being exacerbated, she requested a breathing treatment. She was refused.

131.     Sgt. Radaci shouted for someone to "get the chair", after deeming Ms. Andrews' request for medical care and decision to sit on the floor to manage her vertigo as noncompliance.

132.     Nurse Jen stated, responding to Ms. Andrews' request for her inhaler, "No, [you don't need it]; you're going in the chair." She stated to other staff, "She's hyperventilating. The worst that can happen is she passes out."

133.     Ms. Andrews was forced on to her stomach, still handcuffed. She began to shift her body to adjust to the pressure and new position. Sgt. Radaci repeatedly shouted, "Stop resisting!" to which Ms. Andrews replied that she wasn't resisting. Sgt. Radaci then proceeded to attack Ms. Andrews with his Tazer.

134.    Ms. Andrews was completely subdued, with COs pressing down on her body while she was still handcuffed. Ms. Andrews felt a sharp pain in her right knee and she voiced her concern, crying in pain and asking it to be addressed. Sgt. Falcone then Tazed Ms. Andrews, pressing it into her and activating it for much longer than Sgt. Radaci had.

135.    Captain Young supervised this incident, authorizing the use of the chair.

136.    Ms. Andrews spent approximately 8 hours in the chair. She was not provided with food or water while in the chair. She was not provided with an opportunity for bathroom breaks. Nor was she provided with her medication, including her inhaler. Medical and wellness checks were cursory.

## Deprivation of Necessary Mental Health Treatment

137.    Ms. Andrews was denied adequate mental health care since she first arrived at ACJ.

138.    ACJ does not conduct in-depth intake assessments.

139.    ACJ mental health staff, including psychology and psychiatry staff, do not conduct intake assessments of incarcerated patients' history of mental health conditions and/or treatment.

140.    The cursory nature of the intake process means that ACJ mental health staff do not obtain the information necessary for proper diagnostic evaluations and corresponding treatment plans.

141.    Ms. Andrews has never been questioned by mental health staff about her history of mental health conditions and treatment, both of which are extensive and critical to understanding her mental health conditions and treatment needs.

142.    After Ms. Andrews was processed through intake at ACJ she entered a jail where all mental health contacts are superficial, lasting a few minutes – if that long – at most, and devoid of any diagnostic evaluation, testing, or even basic fact-finding as to her mental state.

143. The diagnoses in Ms. Andrews' mental health records appear to be cut and pasted from entry to entry with no discernible basis as to what information they were originally based on, if other conditions have been ruled out, and what her treatment plan is.

144. Ms. Andrews has not been provided any therapeutic treatment for her mental health condition, neither by psychiatrist Dr. Summers during her incarceration from February to June 2019, nor by Defendants Barfield or McGlynn. She is only provided medication, and often that is mismanaged (see *infra*), even when counseling, group or vocational therapy, cognitive behavioral therapy, or some other treatment modality is clinically indicated.

145. There are no treatment-based reasons for depriving Ms. Andrews from receiving counseling, group therapy, or other types of therapy.

146. Ms. Andrews' records indicate that now and then mental health staff draft a superficial treatment plan, although these plans rarely include anything that can be construed as actual treatment, instead advising that she follow the rules and be advised of the consequences for violating rules, or that she pledge not to harm herself.

147. Any provision of these treatment plans that can arguably be construed as providing for actual treatment are belied in practice, as ACJ mental health staff, including Defendants Barfield and McGlynn, only provide medication and engage in superficial, cell-side encounters.

148. Ms. Andrews has never met with mental health staff at ACJ for more than a few minutes at a time.

149. ACJ also does not employ enough psychiatrists to meet patient need at the jail, a fact that Defendants Harper, Beasom, Zetwo, and Williams are aware of.

150. While on RHU status, all of Ms. Andrews interactions with mental health staff happen at her cell door, even on 5MD, forcing her and the mental health staff to speak loudly through the slot in hearing range of other staff and incarcerated people.

151.    Accordingly, there is no confidentiality in the mental health interactions that Ms. Andrews is afforded while on RHU status.

152.    When Ms. Andrews is not on RHU status she receives medication, but no other meaningful attention from mental health staff.

153.    Mental health staff, including Defendants Barfield and McGlynn, have not made any effort to intervene with custodial staff and advise them that Ms. Andrews should not be in solitary confinement due to the extreme risk it poses to her health. Although there is at least a form in which they can indicate medical/mental health contraindications, they fail to intervene or even record what is obvious: Ms. Andrews cannot be placed in solitary confinement without causing extreme harm and risking her very life.

154.    Even after her multiple suicide attempts, mental health staff, including psychiatrist Summers and Defendants Barfield and McGlynn, do not conduct in-depth confidential interviews to discern the circumstances, causes, triggers, and any other relevant factors leading to the incidents of self-harm.

155.    ACJ mental health staff have simply received her upon her return from the hospital and forced her into a thin, degrading smock known colloquially as the "turtle suit", and when the psychiatrist determines she is stable, based on a visit to the door of her solitary confinement cell, she is removed from the "turtle suit" and returned to solitary confinement status without having received any counseling, therapy, or other treatment intervention that attempts to address and improve her suicidality.

156.    Medication mismanagement is commonplace at ACJ, and it has affected Ms. Andrews as well. The problems with proper dispensation of medication are known to all Defendants, as they are pervasive and reported with virtual unanimity among people incarcerated at ACJ who are receiving medication.

157.    Medication mismanagement resulting in deprivation of mental health care occurs in at least the following ways, all of which have happened to Ms. Andrews:

- Delay in receiving medications that are prescribed at the intake to the jail, resulting in days without proper medication;
- Sudden changes to medication regimes without first being evaluated;
- Failure to advise patients, including Ms. Andrews, of the reasons for prescribing medications, their benefits, risks, and side effects;
- Interruptions in delivery of medications upon transfer to a new housing unit;
- Interruptions in receipt of prescribed medications that can last for days due to failure to properly plan and ensure adequate amounts of prescribed medication;
- Failure to prescribe medications that are clinically indicated, including medications that have been prescribed in the past by ACJ.

158.    Defendants Williams, Barfield, and McGlynn are particularly aware of the myriad problems with medication delivery because they are the subject of routine complaints, and the instances of non-delivery of medications, including in Ms. Andrews' case, are recorded.

159.    Medication delivery problems are further compounded by the lack of training provided to staff by Defendants Harper, Zetwo, Beesom, and Williams pertaining to how to interact with and manage people with psychiatric disabilities.

160.    As a result of these Defendants' failure to train their staff, requests for mental health intervention are frequently ignored, misinterpreted, or result in staff escalating the problem by giving commands and threats to a person who is seeking care and treatment.

161.    This conduct has occurred to Ms. Andrews on numerous instances, including prior to her first suicide attempt, as well as when she was seeking to see mental health staff on September 10 due to not receiving her medication. In both instances staff failed to respond to her request for mental health treatment and spoke to her in antagonistic ways that provoked a reaction consistent with Ms. Andrews' serious mental health diagnoses.

162.    Defendants' failure to train staff has resulted in Ms. Andrews being denied appropriate mental health interventions on multiple occasions when she was requesting such

intervention or it was clearly indicated to somebody trained in identifying symptoms of mental health episodes.

163.     All of the above stated policies and practices amount to a deprivation of the basic minimum standards for mental health care in a jail setting.

164.     Defendants' deliberate failure to remedy these deficiencies has resulted in their knowingly exposing Ms. Andrews to a serious risk to her mental health, and, in fact, causing severe harm and trauma.

165.     Ms. Andrews is in need of court intervention to provide relief for conditions analogous to "putting an asthmatic in a place with little air to breath." *Madrid v. Gomez*, 889 F.Supp. 1146, 1265-66 (N.D. Cal. 1995). She has four times already exhausted the little air provided to her, so to speak, and the next time could very well be her last.

166.     Defendants' conduct is objectively unreasonable and deliberately indifferent to conditions of confinement that deprive her of basic human needs. No penological interest justifies Defendants repeatedly placing Ms. Andrews in such grave danger.

### Causes of Action

### COUNT I – Plaintiff's Solitary Confinement Violates the Fourteenth Amendment to the U.S. Constitution – Against Defendants Allegheny County, and Against Harper, Zetwo, Beasom, and Williams in their Individual and Official Capacities

167.     Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 166 of this Complaint as if fully set forth herein.

168.     Defendants Harper, Zetwo, Beasom, and Williams held Ms. Andrews in solitary confinement despite her serious mental illness and the clear risk of suicide when a person with her mental state is held in such conditions. Defendants did so despite the diagnosis of mental illness that she has and despite her suicide attempts. Defendants did so pursuant to a policy and practice that routinely results in people with serious mental illness being held in solitary confinement. Defendants

further made a specific decision to keep Ms. Andrews in the RHU despite counsel having brought the matter to their attention. They have deliberately chosen to disregard the obvious and intolerable risk of keeping Ms. Andrews in solitary confinement.

169.    Solitary confinement is depriving Ms. Andrews of the basic human needs of mental and physical health, resulting in four suicide attempts and subsequent physical injuries and hospitalizations.

170.    Solitary confinement of Ms. Andrews exposes her to a substantial risk of serious harm in violation of the Fourteenth Amendment to the U.S. Constitution.

### COUNT II – Plaintiff's Solitary Confinement Violates the Americans With Disabilities Act – Against Allegheny County

171.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 166 of this Complaint as if fully set forth herein.

172.    Plaintiff is a qualified individual with a disability as defined in the ADA.  Plaintiff has mental impairments that substantially limit one or more life activities, she has a record of such impairment, and she is regarded as having such an impairment.   Plaintiff meets the essential eligibility requirements in order to obtain services and participate in programs or activities provided by Defendants.  42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

173.    Defendant is a public entity as defined under 42 U.S.C § 12131(1)(A).

174.    Defendants violates the ADA by failing to ensure that Plaintiff, a person with a psychiatric disability, has access to, or is permitted to participate in, and is not denied the benefits of, programs, services, and activities, including but not limited to group recreation and socialization, congregate meals, religious services, and use of the law library.   42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

175.    Defendants violate the ACA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

176.    Defendant violates the ADA by failing to "ensure that inmates or detainees," like Plaintiff, "are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2). Instead, Defendants are holding Ms. Andrews in conditions that place her in serious risk of psychological decompensation and self-harm on account of her disability.

177.    Defendants further violate the ADA by refusing to train and enforce how staff interact with incarcerated people with psychiatric disabilities. Consequently, a pervasive culture of abuse and discrimination exists against individuals with psychiatric disabilities at ACJ, resulting in their being subjected to solitary confinement, use of force, and deprived mental health care due to their disability.

178.    Plaintiff does not pose a direct threat to others, and holding Plaintiff in solitary confinement was not and is not required for the safe operation of services, programs, or activities. 35 C.F.R. § 35.139.

### COUNT III – Plaintiff's Solitary Confinement Violates the Rehabilitation Act - Against Allegheny County

179.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 166 of this Complaint as if fully set forth herein.

180.    Plaintiff is a person with a psychiatric disability and is a qualified individual with a disability as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

181.    Defendant is a recipient of federal funding within the meaning of the Rehabilitation Act.

182.    Defendant violated Section 504 of the Rehabilitation Act by discriminating against Plaintiff, a person with a psychiatric disability, solely on the basis of her disabilities. 29 U.S.C. § 794.

183.     Defendant violated Section 504 of the Rehabilitation Act by failing to reasonably accommodate Plaintiff's psychiatric disabilities in its facility, programs, activities, and services that will allow her to participate in group recreation, socialization, meals, religious services, and use of the law library.

184.     Defendants' use of solitary confinement discriminates against Plaintiff because it is not reasonably related to legitimate penological interests; exacerbates Plaintiff's existing psychiatric disabilities; and fails to provide alternative means for Plaintiff to access programs, services, and activities, even though there are alternative means to house Plaintiff in a safe and cost-effective way.

185.     Additionally, Defendants' enabling and acquiescing in a culture of abuse and discrimination against Ms. Andrews on account of her psychiatric disability has resulted in her being subjected to solitary confinement, use of force, and deprivation of mental health treatment.

### COUNT IV – Excessive Use of Force – Against Defendants Kenneth Wiseman, Tucker, Frank, Radaci, and Falcone in their Individual and Official Capacities.

186.     Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 166 of this Complaint as if fully set forth herein.

187.     Defendants Wiseman, Tucker, Frank, and Radaci's decision to authorize the use of the restraint chair was objectively unreasonable in violation of the Fourteenth Amendment.

188.     Defendants Wiseman, Tucker, Frank, and Radaci's failure to ensure that health and safety precautions such as medical and mental health assessments, provision of food and water, opportunity to exercise, and ability to use the bathroom was objectively unreasonable in violation of the Fourteenth Amendment.

189.     Defendant Wiseman's authorizing the use of pepper spray on Ms. Andrews while she was peaceably sitting in a cell at intake was objectively unreasonable in violation of the Fourteenth Amendment.

190.    Defendant Tucker's attacking Ms. Andrews with a Tazer and striking her and forcibly taking her to the ground was objectively unreasonable in violation of the Fourteenth Amendment.

191.    Defendant Radaci's attacking Ms. Andrews with a Tazer was objectively unreasonable in violation of the Fourteenth Amendment.

192.    Defendant Falcone's attacking Ms. Andrews with a Tazer while she was subdued and not resisting was objectively unreasonable in violation of the Fourteenth Amendment.

### COUNT V – Defendants' Uses of Force Against Ms. Andrews Violated the Americans With Disabilities Act – Against Allegheny County

193.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 to 166 of this Complaint as if fully set forth herein.

194.    Defendant Allegheny County violated the Americans With Disabilities Act by permitting, authorizing, acquiescing in, and otherwise enabling staff to use force against incarcerated people with psychiatric disabilities, including Ms. Andrews, for any reason or no good reason at all. Staff are not trained in how to recognize when a person's behavior is symptomatic of a mental health condition. Staff are not trained in how to interact with people who have psychiatric disabilities so as to de-escalate situations. Staff are not trained in how aversive techniques of discipline and control are psychiatrically contraindicated, likely to result in further non-compliance and decompensation, and result in violence and trauma being inflicted on the psychiatrically disabled.

195.    Defendant substitutes the restraint chair for mental health treatment in violation of the ADA, and did so on multiple occasions against Ms. Andrews.

196.    Planned use of OC spray against Ms. Andrews, a person with asthma, violates the ADA.

**COUNT VI – Defendant's Uses of Force Against Ms. Andrews Violated the
Rehabilitation Act – Against Allegheny County**

197.    Plaintiff hereby incorporates by reference the allegations contained in the above
paragraphs 1 to 166 of this Complaint as if fully set forth herein.

198.    Defendant Allegheny County violated the Rehabilitation Act by permitting,
authorizing, acquiescing in, and otherwise enabling staff to use force against incarcerated people
with psychiatric disabilities, including Ms. Andrews, for any reason or no good reason at all. Staff are
not trained in how to recognize when a person's behavior is symptomatic of a mental health
condition. Staff are not trained in how to interact with people who have psychiatric disabilities so as
to de-escalate situations. Staff are not trained in how aversive techniques of discipline and control
are psychiatrically contraindicated, likely to result in further non-compliance and decompensation,
and result in violence and trauma being inflicted on the psychiatrically disabled.

199.    Defendant substitutes the restraint chair for mental health treatment in violation of
the Rehabilitation Act, and did so on several occasions against Ms. Andrews

200.    Planned use of OC spray against Ms. Andrews, a person with asthma, violates the
Rehabilitation Act.

**COUNT VII – Defendants Deliberate Indifference to Plaintiff's Serious Need for
Mental Health Care Violates the Fourteenth Amendment to the U.S. Constitution - Against
Allegheny County and Against Defendants Harper, Williams, Barfied, and McGlynn in their
Individual and Official Capacities**

201.    Plaintiff hereby incorporates by reference the allegations contained in the above
paragraphs 1 to 166 of this Complaint as if fully set forth herein.

202.    Defendants Harper, Williams, Barfield, and McGlynn are responsible for authorizing,
promulgating, condoning, acquiescing in, and implementing policies and practices for the provision
of mental health services at ACJ that exposed Plaintiff to serious risks and harms due to deficient

28

intake and diagnostic processes that do not ascertain a patient's mental health history; failure to provide any counseling or therapeutic interventions without any medical/mental health reason for failing to provide therapy; lack of confidential interactions with mental health staff for those on RHU status like Ms. Andrews; medication mismanagement in failing to properly inform and advise Ms. Andrews regarding her medication and failure to ensure proper dispensation of medication; failure to intervene in disciplinary practices to protect psychiatric patients like Ms. Andrews from being punished for conduct related to or caused by her psychiatric disability; failure to advocate and take steps to remove Ms. Andrews from solitary confinement and prevent her return due to the demonstrable harm it causes her; failure to conduct an assessment of Ms. Andrews after attempts at self-harm in order to determine the causes of these incidents and develop a  plan to prevent recurrence; failure to develop and implement an actual treatment plan that addresses Ms. Andrews serious mental health needs.

**Prayer for Relief**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.      Award Plaintiff compensatory and punitive damages on all claims;

B.      Enter a Permanent Injunction enjoining Defendants from placing or retaining Plaintiff in solitary confinement or restricted housing units or any conditions of severe isolation that deprive her of her mental health;

C.      Enter a Permanent Injunction ordering Defendants to provide necessary mental health care to Plaintiff, including diagnostic assessments, therapeutic interventions, counseling, and confidential clinician-patient interactions, as well as any other care determined necessary and proper based on the record before the Court.

D.      Grant attorneys' fees and costs;

E.      Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a

jury.

Respectfully submitted,

/s/ Bret Grote
Legal Director
PA I.D. No. 317273
bretgrote@abolitionistlawcenter.org
/s/ Quinn Cozzens
Staff Attorney
PA I.D. No. 323353
qcozzens@alcenter.org
/s/ Swain Uber, of counsel
swain.uber@gmail.com
PA I.D. No. 323477
Abolitionist Law Center
PO Box 8654
Pittsburgh, PA 15221
412-654-9070