**Bradford E Hansen**
3640 J Street
Lincoln, Nebraska 68510
(402) 476-1517        bhansen0723@gmail.com

Kimberly Andrews- Plaintiff v Allegheny County et.al, Case No. 2:19-cv-00670-CCW

April 28, 2021

## I.    Overview

Kimberly Andrews was twenty-years old at the time of the use of force incidents involved in this case and was held as a pretrial detainee at the Allegheny County Jail (ACJ) between February and June of 2019 and again between September and November 2019. She was reincarcerated on two occasions in 2020 as well. Kimberly Andrews spent more than 130 days in solitary confinement during these and later periods of incarceration.  Kimberly Andrews attempted suicide on six occasions while in solitary confinement at ACJ in 2019 and 2020, including her most recent attempt on September 21, 2019, each resulting in hospitalization. During her initial two incarcerations Kimberly Andrews was subjected to uses of force which included the use of Oleoresin Capsicum (OC), electro-shock TASER and was placed in the restraint chair which lasted for several hours.

A. The first use of force occurred on May 22, 2019 when Kimberly Andrews returned to ACJ the day following her first suicide attempt, when she was placed in a holding cell in intake.  She was calm and her mental health condition had stabilized. Kimberly Andrews informed staff she did not feel like harming herself and she objected to being told she was to be placed in an anti-suicide smock and placed in a psychiatric holding cell.  While in the cell Kimberly Andrews refused to place the suicide smock on since it was not working properly.  This left her naked. It was then ordered that Kimberly Andrews be moved out of the holding cell which she was currently in and moved to housing unit 5MD – the mental health unit.  Captain Wisemen put together a compliance team. The compliance team is to use their verbal skills in order to get the inmate to comply with the order.  The team consisted of Cpt. Wiseman, and officers J. Brown, Nowakowski, McQuaid, Morris and Fleisner who attempted to get Kimberly Andrews to comply with a direct order to come to the cell door and be handcuffed and placed on the mental health unit. Cpt. Wiseman gave Kimberly Andrews four

direct orders to come to the cell door, turn around to be cuffed and when Kimberly Andrews did not comply, Cpt. Wiseman sprayed a 2 second burst of OC toward the face area of Kimberly Andrews. Cpt. Wiseman then shut the wicket to the cell. It can be heard on the video tape of the use of force that Kimberly Andrews is claiming she is not going to move until she gets a suicide smock that works. During this time another officer stepped forward and said that if she cuffed up, they would get her another suicide smock. Kimberly Andrews stated she would not turn around with her back showing to be cuffed up until she received a suicide smock that worked. Approximately 90 seconds later Cpt. Wiseman ordered the wicket to be opened again, gave three direct orders to Kimberly Andrews to turn around to the door to be cuffed up. Kimberly Andrews can be heard saying "are you going to get me a smock that works" and Cpt. Wiseman said they would if she cuffed up and Kimberly Andrews can then be heard saying that "she was not going to cuff up". Cpt. Wiseman then sprayed her with another 2 second burst of OC and Kimberly Andrews continued to refuse to be cuffed. It was at this time that Cpt. Wiseman activated the SERT team (Special Operations Response Team). Captain Bosi directed Sgt. Andrascik to assemble an extraction team to remove Kimberly Andrews from her current cell. Sgt. Andrascik stated that the objective of the team was to remove Kimberly Andrews who had already refused all orders from the compliance team. The SERT team consisted of officers: Mat Olean, Kristy Defelice, Josh Smart, Kaylee Weatherford, and Dwayne Hardin. The SERT team was suited up with helmets, vests and one of the officers was carrying a shield. It can be heard on the video of the SERT team briefing from one of the officers' who stated "oh my god Andrews" in response to Kimberly Andrews talking in the background. Sgt. Wiseman gave Kimberly Andrews several direct orders for which she eventually complied. Kimberly Andrews moved to the door, put her hands behind her back and the SERT team was able to cuff her. Kimberly Andrews was secured in the restraint chair per the order of Captain Bosi due to not complying with the compliance team. Kimberly Andrews was not physically defiant during the placement in the restraint chair. Kimberly Andrews was placed in the restraint chair naked at 5:56 and was eventually covered up at 6:58. Both of these times are from the facility video's that were taken by staff. After being secured in the restraint chair staff moved her to cell H9 without incident and she was left in the restraint chair approximately 4 hours. The restraint chair log states that Kimberly Andrews was placed in the restraint chair at 1905 on 5/22/2019 and was removed from the restraint chair 0016 on 5/23/2019.

B. The second use of force incident occurred on May 30, 2019 at 1930 hours. Kimberly Andrews was being returned to ACJ after her second suicide attempt. Sgt. Alyssa Tucker states that she was contacted by Sgt. Greenawalt to facilitate the escort of Kimberly Andrews to housing unit 5MD. Officers Klein and Andrascik assisted with the escort. While moving towards the ground floor to exit the intake area in order to take the elevator Sgt. Tucker states in her report that she ordered Officer Klein to control Kimberly Andrews with a proper escort hold. Sgt. Tucker then states that at some point Kimberly Andrews was able to break free and pin her (Sgt. Tucker) against the wall with her back. Sgt. Tucker then states that she yelled for assistance to other officers in the intake department. Once the officers arrived Sgt. Tucker, ordered Officers Maslanka and Andrascik to take control of Kimberly Andrews. Sgt. Tucker stated that Kimberly Andrews became physically and verbally abusive and due to her aggressive behavior, she pulled her Taser but did not deploy it at this time. Sgt. Tucker stated that Kimberly Andrews then stated, "I'm going to make you use that taser bitch". Once they were near the threshold of elevator 2 Sgt. Tucker states that Kimberly Andrews was able to break free from the holds of Officers Maslanka and Andrascik. Once Kimberly Andrews breaks free Sgt. Tucker states that she used her forearm to create distance between Kimberly Andrews and herself and then deployed her taser into the back of Kimberly Andrews. This push resulted in Kimberly Andrews falling face first onto the elevator floor. The video recording of this incident from the time Kimberly Andrews was escorted through the hallway and into the elevator contradicts Sgt. Tucker's version of events. At this time Kimberly Andrews was cuffed with her hands in front and her legs were in leg irons. Sgt. Greenawalt ordered a restraint chair and assisted with moving Kimberly Andrews to the front of the elevator. At this time Sgt. Tucker states that Kimberly Andrews began resisting at which time Sgt. Tucker cycled her taser for 5 seconds while the probes were still in her back. Sgt. Tucker states that Kimberly Andrews continued to resist and kicked Officer Andrascik in the hand. Sgt. Tucker followed up with a drive-stun to Kimberly Andrews' upper thigh to gain a 3-point contact with her taser. Once the follow up drive-stun cycle was complete Kimberly Andrews stopped resisting. The video shows that at times, six officers were on top of Kimberly Andrews holding her feet and upper body. Kimberly Andrews was placed in the chair and her cuffs were removed in order to secure her arms and legs in the restraint chair. Sgt. Tucker placed her taser on the back of Kimberly Andrews in case she started to resist but it was not needed as Kimberly Andrews was now compliant. Kimberly Andrews was placed in the restraint chair and moved to H9. Kimberly Andrews

was placed in the restraint chair by Sgt. Tucker at 1930 pm 5/30/2019 and removed at 0425 on 5/31/2019 which was approximately 9 hours.

C. The third use of force incident occurred on October 22, 2019. Kimberly Andrews was in housing unit 5MD cell 27. At approximately 1110 hours Kimberly Andrews was seen on the video ripping her state issued white t-shirt and then standing on top of the sink and tying the t-shirt around her neck and the other end around the sprinkler head that was located above the sink near the ceiling. Officer Tokarsky called for an escort to 5MD cell 27 to come to the pod immediately. Sgt. Lee heard the call and responded to the scene. While in route to 5MD Officer Tokarsky called over the radio to ask permission to enter the cell with another officer. It can be seen on video that Officers Tokarsky and Nalley hold Kimberly Andrews while officer McMasters cuts the t-shirt from the sprinkler head. Captain Frank and Sgt. Raible ordered Kimberly Andrews to be placed on the bunk face down and handcuffed. Kimberly Andrews at this time can be seen banging her head on the metal bunk. It was decided to call for the restraint chair. Cpt. Stephanie Frank states in her written report that she drew her taser, placed the taser on Kimberly Andrews' back to gain compliance to be handcuffed. It can be seen on the video that five male officers secured Kimberly Andrews face down on the metal bunk with handcuffs. When Cpt. Frank returned to the cell with scissors and forcibly cut Kimberly Andrews' clothes off her. Cpt. Frank can be seen on the video ripping off Kimberly Andrew's underwear. Kimberly Andrews is now naked with 5 men holding her down on the table. Sgt. Lee Drew his taser to Kimberly Andrews back to help control Kimberly Andrews' movements while Cpt. Frank continues to cut Kimberly's clothes off. Kimberly Andrews was placed in the restraint chair due to her banging her head and kicking at staff. Kimberly was taken to H9 in the restraint chair. Officer's admitted using pain compliance techniques on Kimberly Andrews. The required Restraint chair form was included in the use of force packet, but it was only filled out at 1115 when Kimberly Andrews was placed in the restraint chair and was not completed in order to indicate how long the restraint chair was used and if the required checks were completed.

D. The fourth use of force incident occurred on November 8, 2019 at approximately 1245. Kimberly Andrews was housed on 5MD and was in the day room handcuffed to a table for her second hour of recreation from 1200 to 1300 hours. Officer Johnson was working the housing unit and noticed that Kimberly Andrews was laying her head down on the recreation table. Officer Johnson approached Kimberly Andrews and attempted to see if she was coherent. Kimberly Andrews

was not responding to any of his commands.  Officer Johnson then asked 5MD medical personnel to observe Andrews.  The medical personnel advised Officer Johnson to call a medical emergency for which he did.  Medical personnel responded and determined that she was breathing normally and then turned their attention to another emergency that was happening on the unit.  Approximately 7 minutes later when Medical returned to the table where Kimberly Andrews was still cuffed and unresponsive began applying ammonia to try to get her to respond.  Kimberly Andrews can be seen on the video start to stir and began pushing the arm and hand of medical away.  The restraint that was attached to the table was removed and Officer Johnson and Sgt. Radaci then attempted to escort Kimberly Andrews back to her cell because medical said she was okay.  Kimberly Andrews appears to not be able to walk and she was moved to the floor.  Several staff maintained tight control when Kimberly Andrews started to thrash about swinging her arms and legs while on the floor face down.  Sgt. Radaci deployed his taser to gain compliance.  Sgt. Falcone was also present during this use of force incident and also determined that to control the thrashing about by Kimberly Andrews a deployment by his taser was also required.  Sgt. Falcone used his taser on Kimberly Andrew's thigh while she was being strapped into the restraint chair. Kimberly Andrews was placed in the restraint chair and moved to the processing area into cell 3.  Kimberly Andrews was placed in the restraint chair at 12:45 but the rest of the form was not filled out as required by the restraint chair policy. A separate report written by Capt. Bosi stated that she was removed from the restraint chair at 20:20 hours, which was 7 hours and 35 minutes after she was placed in the chair.

## II.    Introduction and Background

My name is Bradford E Hansen, and my office is at 3640 J Street, Lincoln, Nebraska 68510.  I have over 44 years of experience in all aspects of corrections coupled with experience in assisting other state correctional agencies and county jails in the development of emergency preparedness training and security improvements. I retired as Warden of the Tecumseh State Correctional Institution, Tecumseh, Nebraska on August 2, 2019. Since August 2, 2019 I have been retained as a Crisis Intervention/Conflict Resolution Instructor and as an expert witness.

I graduated with a Bachelor of Arts degree in History in May of 1975. Immediately after college I worked for the Lincoln YMCA and the Nebraska Department of Health and Human Services until I joined the Nebraska Department of Corrections in October 1977 as a correctional

officer. I worked at the Nebraska State Penitentiary and Lincoln Correctional Center from 1977 until 1997. During that time, I promoted from correctional officer to Unit Administrator. As Unit Administrator I was responsible for managing all inmate housing units, classification, accreditation, litigation reports and was a member of the executive team that developed standards, operating procedures and conducted inspections to ensure compliance with safety and sanitation standards.

In 1997 I promoted to Department Emergency Management Supervisor and held that responsibility until 2016. I managed the Emergency Tactical teams which included the Special Operation Response Team (SORT), Correctional Emergency Response Team (CERT), and the Crisis Negotiation Team (CNT). I developed training, techniques, decision making and assault strategies. I was certified as an Emergency Preparedness instructor and implemented new emergency preparedness training for the Nebraska Department of Corrections. I was responsible for conducting critical incident reviews to determine what went well and what could have been done better. The critical incident review included a written report as well as an action plan which identified tasks to be completed.

In 2003 I instituted the Division of Investigation which included hiring two full time law enforcement officers to conduct investigations and supervised investigations within the department. The investigations included criminal, administrative, workplace harassment, and Prison Rape Elimination Act (PREA). Reviewed all reports and submitted to proper authorities. Developed and conducted training for institutional investigators for procedural and informationally correct investigations. Reviewed policy and made recommendations for staff oversight and accountability. I am trained in the Reid technique and the Wicklander methods of interviewing. Reviewed and approved approximately 75 investigations a year. Reviewed use of force reports that rose to the level of possible abuse or unlawful use of force.

I was given the additional responsibility of Training Administrator in 2012. Duties included the oversight and supervision of the Department training academy, which included new officer training, in-service training, leadership training for supervisors, leadership training for executive staff and new training to assist in the development of all staff. I implemented the Law Enforcement and Training Association's (LETRA) Crisis Management training which included communication skills with inmates, how to deescalate crisis events, how to conduct conflict resolution and how to interview inmates/detainees to assist in determining if they are suicidal or experiencing a psychotic event. Staff were taught to

document such interaction and make referral to mental health specialists and/or shift supervisors. Implemented policy, procedure and training for the use of chemical agents.

In March of 2016 I was assigned as Warden at the Tecumseh State Correctional Institution. Tecumseh is a 1000 bed maximum and medium custody institution which included a 196-bed restrictive housing unit. As Warden I directed the work of 420 staff in the areas of security, staff training, medical, mental health, unit management, development of procedures and post orders, accreditation and reception/orientation. Responsible for conducting critical reviews of serious incidents which included serious disturbances, inmate death and staff assault. Planned, organized and coordinated prison operations with other functions within the agency, and to ensure program objectives and standards were established and attained.

I have been involved with consulting with LETRA, from 1997 to the present. LETRA is a training organization in Campbell, California and specializes in emergency preparedness training, Crisis Intervention/Conflict Resolution training, use of force training and conducts emergency preparedness, use of force assessments in state prisons and county and city jails. I conducted emergency preparedness assessment and emergency preparedness training in South Carolina Department of Corrections, Delaware Department of Corrections, Douglas County Jail, Omaha, Nebraska, the New Mexico Department of Corrections and the Wyoming Department of Corrections. I conducted Crisis Intervention/Conflict Resolution training for the California Youth Authority and the Hawaii Department of Corrections. I conducted Use of Force training at the Santa Clara County Jail, California.

I did consult work for the National Institute of Corrections (NIC) from 1999 – 2008. I conducted instructor certification in Crisis Negotiations for the South Dakota Department of Corrections, New Mexico Department of Corrections and Nevada Department of Corrections. In 2008 I conducted an emergency preparedness audit for the Washington State Department of Corrections.

I reserve the right to add to or change the opinions in this report if and when additional relevant information becomes available to me after the date of this report.

A copy of my resume is attached to this report as Appendix A.

I charge $225 an hour for consultation, document review and other preparation activities and $250.00 an hour for actual testimony at trial or in deposition. My compensation will not be affected by the outcome of this case. A copy of my fee schedule is attached as Appendix B.

Documents that I reviewed to reach the conclusions that I made are listed in Appendix C.

I was retained as an expert witness in this action by Bret Grote Abolitionist Law Center, Pittsburg, PA in March 2021.

I am not a medical expert and I have not been asked nor have I attempted to form opinions about medical treatment issues in this case.

My previous and current experience as an expert witness are as follows:

1. Casey Teskoski v. Wood County - Case No: 19CV 95 – expert witness for the plaintiff (deposed)(completed) - 2019
2. Tyreke Vann-Marcouex v. Wood County– Case No: 19 CV 94 - expert witness for the plaintiff (deposed)(completed) - 2019
3. Juan Geronimo Mendoza v. Collette Peters (Oregon Department of Corrections) – Case No: 2:18-CV01663-HZ – expert witness for the plaintiff (current) - 2019
4. James Werby v. Collette Peters (Oregon Department of Corrections) Case No: 2:18-CV01828-HZ – expert witness for the plaintiff (current) - 2019
5. Estate of Brandi M. Lundy v. State of Tennessee (Department of Corrections) Claim no. T20191358 – expert witness for the claimant (current) - 2020
6. Brenda Kay Nordenstrom v. Corizon Health, Inc: Clackamas County, Oregon, Civil Action No, 3:18-cv-01754-HZ – expert witness for the plaintiff (current) – 2020
7. New Mexico Immigrant Law Center complaint against ICE at the Torrance County Detention Center – November 2020- use of force 0 (current)
8. Dence v Wellpath et al. – case number 1:20-cv-00671-CL, March 202, Portland Oregon (current)
9. Yahi Abdul Shiheed v Brandon Opel et al – April 2021 – (current) Baltimore Maryland

III. **Method**

A. The crux of this case is Plaintiff's contention that Defendants had a duty to protect detainees in the Allegheny County Jail from known threats

of harm, including harm from staff use of excessive and/or unnecessary use of force. Defendants argue that they fulfilled their duties to protect these Plaintiffs.

B. Within contemporary American corrections there is well-established methodology for addressing the kinds of questions raised in this case. The first step is to determine applicable duties, looking to relevant law and regulations, to departmental policies and procedures, to professional standards and to widely accepted correctional standards and practices. The second step is to determine whether the various duties identified have been complied with or have been breached by examining documents and other information available in the case as well as facts from other sources that might illuminate the defendants' compliance or lack of compliance with the various duties identified. An additional step in this analysis is to examine the existing policies, procedures and practices to determine whether they are wrongly formulated or insufficient. That is most often accomplished by comparing them to legal and regulatory requirements and/or to comparable policies, procedures and practices in use in other correctional agencies. An additional important step in this method is to, where possible, review the results of those policies, procedures and practices in question to determine whether they have been effective at accomplishing their objectives.

C. The method summarized above is not exclusive to expert analysis of prisoner tort cases alleging failure to protect. It is also the general method used for auditing correctional institutions for accreditation, whether by the American Correctional Association (ACA) or by the National Commission on Correctional Health Care (NCCHC). It is also used as a major component in critical incident reviews following major crises or emergencies in jails and prisons. This method has been used by this consultant in conducting critical incident reviews, emergency readiness of institutions, security audits and criminal and administrative investigations.

D. In addition to the method described above, the analysis of the record in this case must also reach the questions of whether it was reasonably predictable that the harm that occurred to the Plaintiff would occur if the various identified duties of the Defendants were not fulfilled, and whether Plaintiff's injuries in this case was a direct result of the breach of those duties by the Defendants.

E. The second method has to do with situations in which there are fundamental disagreements about what factually happened. The first

step in this procedure is to identify each action, behavioral procedure or other occurrences according to each side in the factual dispute. Then, each of these disputed steps, behaviors, actions, decisions, or the like must be analyzed against the prevailing practices in the facility, specific agency policies and generally accepted correctional practices. They must also be analyzed for internal consistency. That is, from the standpoint of correctional policies, procedures and practices in the institution, as well as generally accepted correctional practices, are the various occurrences, decisions and behaviors described by the Plaintiff consistent with each other? Put another way, does the Plaintiff's story make sense, not because of credibility or lack of credibility of the Plaintiff, but because of what is known about jail policies, procedures and practices. The same analysis must also be performed with regard to the Defendant's story.

IV.     **The Duty to Protect**

A.  It is indisputable that the staff of correctional facilities have a broad and critically important duty to protect the individuals who are incarcerated within the facility. That duty to protect is reflected in state and federal law, in regulations, in correctional agency policies and procedures, and in long-standing correctional practices across American corrections.

B.  The staff duty to protect inmates is not hard to understand. There are many ways in which inmates cannot protect themselves. In a fire, inmates locked in cells cannot evacuate themselves; either staff unlock doors and provide a path to safety or detainees may die of smoke inhalation. Similarly, an inmate who is acutely ill cannot take himself to an emergency room; either the staff provides that inmate with access to medical services, or the results may be fatal. Inmates are dependent on staff for everything from showers to food; life safety may be the first of these dependencies.

C.  The broad duty of staff to protect inmates applies whether the correctional facility in question is large or small, urban or rural, and also whether it is low security or a "super-max" facility. It also applies whether the facility is public or private. This duty applies whether the individuals in question are pre-trial or convicted and whether they are incarcerated pursuant to criminal justice statutes or ICE statutes.

D.  Within the general duty to protect detainees, correctional facility staff have a number of specific duties that are also long established and beyond debate. Thus, staff have a duty to protect inmates from illness

and other health hazards, from suicide, from the results of mental illness and from violence from other inmates. One of the most specific and obvious duties in this regard is the staff responsibility to protect inmates from staff use of force that is unnecessary or excessive.

E. Importantly, Defendants do not dispute either their duty to protect detainees in general or their specific duty to protect detainees from unnecessary and/or excessive force by staff.

F. The duty to protect inmates at the Allegheny County Jail from unnecessary and/or excessive use of force by staff is emphasized in the Use of Force Policy #207 (revision date 4/28/20) and Emergency Restraint Policy #208 (revision date 4/28/20). That Use of Force policy, on the first page states: "Inmates shall not be subjected to personal abuse, corporal punishment, personal injury, disease, property damage or harassment. "Furthermore, the Emergency Restraint Chair policy on page one state: "The Emergency Restraint Chair will never be used as a form of punishment. The Emergency Restraint Chair is always to be used to prevent harm to employees of the Allegheny County Bureau of Corrections, members of other agencies, civilians and inmates.

## V.    Analysis and Opinion

### A. Allegheny County Jail Use of Force Policy

1. Use of force policy is essential in correctional facilities in order to set the tone and provide a clear understanding to staff as to what the philosophy of using force entails and under what circumstances force can be used. Use of force policy can also be used to inform inmates under the care of correctional staff under what conditions force may be used against them.

2. The philosophy surrounding the use of force in correctional institutions has changed dramatically the last 44 years and for the better. The philosophy has changed in that each incident where force might be used is now looked at from the standard was force necessary and to the degree force was used was it excessive. Each use of force incident is looked at within the parameters of existing facility policy. Each facility use of force policy is now reviewed in terms of whether it meets national standards. No longer are we in the days where the mind-set of getting compliance from an inmate needed to be quick, swift and consistent or else it was feared that that particular inmate would

not learn his or her lesson, thus increasing the likelihood that inmate would repeat that action in the future.  In fact, the entire population needed to understand this philosophy of the correctional administration.  The philosophy has now changed to include the terms "time and distance".  If the actions of the inmate are not harming a staff member or other inmates, harming themselves, demonstrating actions that could harm the facility i.e., start a fire or other physical plant damage, staff should first ask is the use of force action necessary right now or could it wait in order to let the inmate calm down and maybe use verbal skills to deescalate the situation.

This philosophy has not only been adopted and placed in use of force policies, but staff are also now required to attend crisis intervention training to learn the verbal techniques and practice the skills through role playing and instructor critique.  Learned verbal skills are not intended to be a staff member giving several direct orders to the inmate and then if they do not comply tell them that you will now use force to get them to comply.  Learned verbal skills are intended to teach staff to talk to the inmate and understand what their concerns are.  Staff are instructed to use a calm and caring understanding tone in order to truly understand what the inmate's issues are.  Once this is understood can the staff member make a decision to assist the inmate in their needs and wants in order that force will not be used?  Requiring staff to follow this philosophy can change the culture of a facility.  A culture where there is a belief and actions that follows that belief that force is only used as a last resort and has everything else been tried before force is used.

3.  The Allegheny County Jail is accredited by the American Correctional Association ACA) and is audited every three years.  The ACA standards are considered a nationally accepted way of doing business in correctional facilities.  The standards that are used in the audits are from the Core Jail Standards First Edition 2010. On page 20, 2B it states "Physical force is used only in instances of self-protection, protection of the inmate or others, prevention of property damage, or prevention of escape.  On page 20 under Expected Practices there is a paragraph entitled Restrictions on Use of Force -1-CORE-2b-01and it states "The use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with

appropriate statutory authorization.  In no event is physical force used as punishment".

The Allegheny County Jail follows PA Title 37 Chapter 95. County Correctional Institutions – 95. 241.Security (2) Use of Force, which states (i) Force shall be restricted to instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to effect compliance with the rules and regulations of the facility when other methods of control are ineffective or insufficient and only the least amount of force necessary to achieve that purpose is authorized. Force may not be used as a means of punishment or revenge.

The Allegheny County Jail Use of Force Policy #207 which was written 10/2/14 and revised 4/28/2020 states the following under Guidelines:

- Inmates shall not be subjected to personal abuse, corporal punishment, personal injury, disease, property damage or harassment.

- Use of force against an inmate is authorized when an employee reasonably believes such force is necessary to accomplish any of the following objectives:

  a.    Protection self or other staff members
  b.    Protection of property from damage or destruction
  c.    Prevention of an escape
  d.    Recapture of an escapee
  e.    Prevention of an act of crime
  f.    Ensure compliance with Allegheny County Bureau of Corrections rules and regulation when other methods of control are ineffective or insufficient.

- When force is required, the least amount of force the employee reasonably believes is necessary to achieve the authorized purpose is to be used and the use of force will stop once control is achieved.

- Force is not authorized as a means pf punishment or revenge.

- Supervisory staff will continually provide direction to subordinates in all use of force occurrences.

- The employee must be able to articulate the level of force applied in a written report and be prepared to testify in a court of law about any use of force incident.

4. The Allegheny County Jail uses two different teams that are authorized to use force in a planned use of force when there is time to set these teams up. If time allows, a compliance team is organized, led by a supervisor, to try to use their verbal skills to talk the inmate into compliance. If these actions do not work then a SERT team (Special Emergency Response Team) that requires additional training and certification is activated, and then that team is responsible for making sure the inmate complies with all requests. Many times, this team is used as a cell extraction team.

   The use of force continuum that is in the Allegheny County Jail Use of Force policy states that a show of force is the lowest level of force. In the paragraph below the use of force continuum it states that with all levels of force verbal commands must be given, during and after any type of force. Verbal commands are not de-escalation skills. Verbal commands are direct orders that if not followed an escalation of force will be used. This type of language escalates a situation instead of deescalating the situation.

5. The Allegheny County Jail (ACJ) outpaced all other jails in Pennsylvania when it comes to use of force incidents. Statistics as taken from County Prison Extraordinary Occurrence Statistics for 2015 – 2019 as taken from www.cor.pa.gov show there were 414 use of force incidents in 2015 with increase to 720 in 2019 (74% increase). In 2019 ACJ had more uses of force than any other jail in Pennsylvania. The use of the restraint chair was 184 times in 2015 and was 339 times in 2019 (84% increase). In 2019, ACJ used the restraint chair 339 times, which was almost four times more per capita than the rate for all other jails in Pennsylvania. In contrast, all five Philadelphia jails combined did not use the restraint chair on a single occasion in 2019. The use of chemical agents used in 2015 by ACJ was 50 and 122 in 2019 (almost 144% increase). The use of stun guns/tasers at ACJ was 41 in 2015 and 146 in 2019 (up 256%). ACJ officers used tasers 146 times, approximately 12 times more on a per capita basis than all other jails in the state. Pennsylvania has 67 jails and ACJ alone accounted for a full 50% of all uses of tasers in 2019. These numbers are extraordinary, and it is evidence that there is a culture that has been created by the Administration where force is being approved in situations where it was not necessary or at the

very least other methods should have been tried before the use of force was escalated.

6. The use of force policy should include a section that describes what verbal de-escalation is and that if time permits it should be used. De-escalation should be documented on the use of force packet to show that it was attempted. Direct orders are not intended to de-escalate the situation. Staff need to be trained in the difference between the two. De-escalation skills go hand and hand with the terms I used before: "time and distance". All staff, including supervisors, need to determine if in fact the direction needs to happen at this particular moment, or can it wait so maybe the situation can deescalate with time and periodic talking with the inmate by staff. The use of force incident on May 22, 2019 is a clear example of the point I am making. Kimberly Andrews was in a cell in the holding area and Sgt. Wiseman was ordered to put together a compliance team, remove Andrews from her current cell and move her to a cell in 5MD. Sgt. Wiseman approached the cell door and gave a direct order to Andrews to come to the wicket, turn around and be cuffed up. Kimberly Andrews stated that she was not going to do it until she received a new suicide smock since the smock she had would not stay on. Kimberly Andrews said she would not step to the door and turn around and show her "naked ass" to the mostly male group that had assembled. Sgt. Wiseman gave Andrews several direct orders and then stated that if Andrews would cuff up, he would get her a different smock. Andrews said no she wanted to be covered up. Sgt. Wiseman then sprayed Kimberly Andrews with OC and shut the wicket. Approximately 1½ minutes later Sgt. Wiseman came to the door and again gave Kimberly Andrews several direct orders to cuff up which she refused and then he sprayed OC a second time and shut the wicket. Sgt. Wiseman then activated SERT to remove Kimberly Andrews from the cell.

This example is evidence that while staff will use the term de-escalation, they do not understand what it means. Staff are confusing direct orders with de-escalation verbal skills. It is also an excellent example of not using time and distance. Why did the move have to take place at this instance and why couldn't Sgt Wiseman make the decision to give Kimberly Andrews a new smock in exchange for the other and see if that would de-escalate the situation so that force would not be needed? There is no harm in trying something like this. If it works, no force is necessary, and it saves the possibility of the inmate or staff getting hurt in the use of

force. The more lasting result of reacting this way to a defiant inmate is to let them know that it is more important for staff to listen and try to resolve each situation without force. This is difficult for some staff to accept and must be supported by the Administration in their words and deeds.

7. The Allegheny County Jail's Use of Force policy states force against an inmate is authorized f) to ensure compliance with Allegheny County Bureau of Corrections rules and regulations when other methods of control are ineffective or insufficient. This section is so general that force could be used if an inmate called them names and would not stop, if an inmate refuses to eat a meal because they do not like what is being served, refuses to clean their cell as required by sanitation rules, or verbally threatens a staff member but does not display any aggressive actions. These actions by inmates may require a discipline report but certainly never require a use of force. Use of force cannot be general in nature. It must be specific and understandable. Training must cover different circumstances where force can and cannot be used and how staff will be held accountable if they do not follow the policy.

8. The Allegheny County Jail use of force policy has led to the kind of use of force statistics as indicated above. This has contributed to a culture of increased uses of force that in some circumstances are not necessary and are detrimental to the welfare of the inmates, in this case Kimberly Andrews.

## B. Use of the Restraint Chair

The last 40 years in corrections has seen an influx of new technology that on face value is an improvement to protect inmates and staff from injury. The development of OC, Tasers, Electronic Restraint devices and Restraint Chairs. These are good if used properly, in the right situation and not in a retaliatory way. As with any device which may lead to a use of force it is a must that there is strict management oversight and a clear understanding as to what are acceptable practices.

1. ACJ used the restraint chair 339 times in 2019, which was 4 more times per capita than the rest of the jails in Pennsylvania. These numbers present an obvious concern about how ACJ is using the restraint chair.

ACJ has a specific policy for the use of the Emergency Restraint Chair. The policy number is 208 with an effective date 5/28/08 and a revision date of 4/28/2020. Under the procedural guidelines the following relevant sections are listed:

a.     The Emergency Restraint Chair will never be used as a form of punishment. The Emergency Restraint Chair is always to be used to prevent harm to employees of the Allegheny County Bureau of Corrections, members of other agencies, civilians and inmates.

b.     The use of the Emergency Restraint Chair will always be used under the direction of an operations Supervisor (Sergeant or above, Deputy Warden (s) or Warden.

c.     The Use of the Emergency Restraint Chair will be used to prevent violent, uncontrollable behaviors, or negative interactions between persons in the custody of the Allegheny County Bureau of Corrections including arrestees who have not yet been arraigned or processed.

d.     The Emergency Restraint Chair may be used to prevent an individual from self-injury, injury to others, or serious property damage when other techniques have been ineffective in assisting the individual in controlling themselves.

e.     The Emergency Restraint Chair may be used as a means of moving a combative inmate safely from one section of the facility to another when no other alternatives are available.

f.     A Supervisor will make a field assessment of an individual's behavior or condition and from that assessment determine if the use of the Emergency Restraint Chair is appropriate.

l.     An inmate or detainee who declares suicidal ideations or actions and refuse placement into a Suicide Gown will be placed in the Chair.

j.     If and when an individual/inmate refuses to answer the medical admission questions the individual/inmate will automatically be considered a high protentional for suicide risk. Their behavior would then determine if they are willing to be placed into a suicide gown or go directly into the Restraint Chair for their own safety.

k.     Every instance of the Emergency Restraint Chair's use will be recorded unless a delay may cause injury to an employee or inmate.

m.     Once an inmate is secured in the Restraint Chair, Healthcare Personnel shall be responsible for checking the restraints for tightness.

n.  Visual checks of inmates placed in the restraint chair must occur every 15 minutes.  Time checks are to be documented on the restraint chair form.

o.  An inmate may only be in the Emergency Restraint Chair for 8 hours.  Only the Warden or designee can authorize an inmate to be in the restraint chair for over 8 hours.

p.  The inmate will be afforded the opportunity to have their limbs exercised every two hours.  This will be documented on the Restraint Chair form.

q.  A supervisor or staff member will be tasked with monitoring the individual/inmate in the restraint chair at least every hour by:

- Speaking with the Individual
- Checking the restraints for comfort and security
- Developing an appropriate plan for release
- Checking that all appropriate forms have been filled out in a timely manner.

2. Nationally, the policy of the restraint chair has evolved over the recent years where now it is common practice that a restraint chair will not be used for more than two hours and only under extraordinary circumstances can the time be extended.  Two hours is considered more than enough time to involve medical or mental health to determine a plan of action if the inmate continues to be uncontrollable while in the restraint chair.  During that two hours inmates are checked on every fifteen minutes to talk to them, assess their control, determine if they should be released from the chair into a secure cell, check on their position in the chair and determine if medical or mental health should come back and assess them.  Policy should also dictate that under no circumstances should supervisors assume that inmates have to stay in the chair for the entire two hours.  Any longer than two hours should be documented as to the reason why and what steps were taken to try to remove the inmate from the chair.

Placing an inmate in restraints, whether it is handcuffs, restraint chair or four/five-point restraints on a bed, the national standards are clear – restraints are not used as punishment and they are never applied for more time than is necessary.  The ACA Core Jail Standards – first edition states in standard 1-CORE-2B-02 -Restraint devices are never applied as punishment.  There are defined circumstances under which supervisory approval is needed prior to application.  Standard 1-CORE-2B-03 (mandatory standard)

addresses the use of four/five-point restraints. This is the standard that correctional jails should follow since the restraint is the securing of both arms and both legs. This standard addresses the following:

Four/five-point restraints are used only in extreme circumstances and only when other types of restraints have proven ineffective. Advance approval is secured from the facility administrator/designee before an inmate is placed in a four/five-point restraint. Subsequently, the health authority or designee is notified to assess the inmate's medical and mental health condition, and to advise whether, based on serious danger to self or others, the inmate should be in a medical/mental health unit for emergency involuntary treatment with sedation and/or other medical management, as appropriate. If the inmate is not transferred to a medical/mental health unit and is restrained in a four/five-point position, the following minimum procedures are followed:

- Continuous direct visual observation by staff prior to an assessment by the health authority or designee
- Subsequent visual observation is made at least every 15 minutes
- Restraint procedures are in accordance with guidelines approved by the designated health authority
- Documentation of all decisions and actions

The National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails dated 2018 addresses when restraints are ordered by custody in standard J-G-01 Restraint and Seclusion paragraph 2:

a. When restraints are used by custody staff for security reasons, a qualified health care professional is notified immediately to:

- Review the health record for any contraindications or accommodations required, which, if present, are immediately communicated to custody staff
- Initiate health monitoring, which continues at medically appropriate intervals as long as the inmate is restrained. If the inmate's health is at risk, this is immediately communicated to appropriate custody staff
- If health staff are not on duty when custody ordered restraints are initiated, it is expected that health staff

review the health record and initiate monitoring upon arrival.

    b. If the restrained inmate has or develops a medical or mental health condition, the provider is notified immediately so that appropriate orders can be given

    c. When health staff note use of restraints that may be jeopardizing an inmate's health, this is communicated to custody staff immediately.

It was my personal experience as a Warden concerning restraint chairs that in order to make sure I was aware when and for what reason the restraint chair was to be used, I moved the approval for the use of the restraint chair from the shift supervisor to me. As head of the institution, I wanted to make sure that we were not using the restraint chair for reasons that were not allowed. This one act alone reduced the use of the restraint chair at the Tecumseh State Correctional Institution where I was a Warden. This is the reason I advocate that the approval process to use the restraint chair at ACJ be moved to the Warden level.

3. Warden Harper when asked in deposition what the emergency restraint chair was, he responded: "is a chair that's utilized to ensure that the individual that is violent – that is a threat to themselves, a threat to others – this chair is used to prevent them from hurting themselves and others and curb that violent attitude that they are toward themselves and others." Warden Harper was asked if he knew how long the inmate can be placed in the restraint chair, he responded "that he was unsure and would have to look at the policy." Warden Harper was asked if staff were trained in the use of the restraint chair and he said, "staff were, but was not sure what the training consisted of." Warden Harper admitted that he did not participate in the annual training that staff are required to attend.

Warden Harper was asked the question in his deposition (page 97) so is staff permitted to use force against an inmate for any violation of ACJ policy? Warden Harper responded, "Absolutely."

Warden Harper's lack of understanding of the use of force policy which includes the restraint chair is alarming. The statement that he made in his deposition at the end of his explanation as to what circumstances the restraint chair can be used, is a prime example of why the numbers of the use of the restraint chair in 2019 where so high at ACJ. These numbers represent a glaring and harmful misuse

of the restraint chair.  His statement concerning use of the restraint to curb one's violent attitude is not why the restraint chair is used. This understanding of the use of the restraint chair corresponds to the statement that Randy Justice, Training Sgt. for ACJ, stated on page 108 in his deposition when he admitted that an inmate refusing a direct order, they go into the restraint chair.  The Warden admits that the restraint chair is used as a device to change one's behavior and the Training Sgt admits that if an inmate refuses a direct order, they will go in the restraint chair.  This completely violates ACJ policy on the use of restraint chairs and also ACA and NCCHC standards.  Supervisors were authorizing the use of restraint chair as punishment and discipline.  ACJ staff is using the restraint chair in retaliation for inmate behavior.  If an inmate is verbally threatening, disobeying any direct order, or disruptive they go in the restraint chair.  The restraint chair should only be used as a safety tool and used for those limited times when it is absolutely necessary. It is obvious that it was not necessary to place Kimberly Andrews in the restraint chair during the incidents I was asked to review.

4. Kimberly Andrews had four uses of force against her that I was asked to review, and each time was ordered to be placed in the restraint chair.  Each restraint chair form in each use of force was not filled out properly and there is no explanation attached as to the reason why by the Cpt. who is reviewing the use of force packet which contains the restraint chair form.  The first form was dated 5/22/2019 and states that Kimberly was placed in the restraint chair at 1905 and removed from the restraint chair on 5/23/2019 at 0016.  The reason for this placement was "Refusing order to be removed from the cell".  That was approximately 4 hours Kimberly Andrews was left in the restraint chair completely and tightly secured.  The time checks were not completed properly. From the time Kimberly Andrews was placed in the chair at 1905 the first time check did not occur until 2202, nearly three hours later. The form does not record the times where exercise was offered and if a bathroom break was offered.  There is no explanation as to why Kimberly Andrews was left in the restraint chair and not removed sooner.  This lack of concern over the proper filling out of this form is in violation of the ACJ restraint chair policy.  Placing Kimberly Andrews in the restraint chair for disobeying a direct order is punishment and retaliatory.

The second use of force for which Kimberly Andrews was placed in the restraint chair was on 5/30/2019.  Kimberly Andrews was placed in the chair at 1930 hours and released from the chair on 5/31/2019

at 0425 hours. The form states that the reason for placement was inmate was resisting officers and became combative. This was for a total of approximately 9 hours. Current ACJ restraint policy dictates that a chair cannot be used for more than eight hours. Reviewing the time checks again it is obvious that the checks were not completed as policy dictates. Exercise times were recorded as being refused by Kimberly Andrews, per policy. Again, there was no indication that anyone talked to Kimberly Andrews nor was there any indication why Kimberly was left in the chair for 9 hours. Instead of placement in the chair why not transport her to a cell and assign her there instead of leaving her in the restraint chair. The use of the restraint chair was to teach Kimberly a lesson and was used as punishment for her previous behavior. Not completing the required checks, staff may and will miss an opportunity to protect the life of Kimberly Andrews if something goes wrong while she is in the chair.

The third use of force was October 22, 2019 when Kimberly Andrews attempted suicide and was placed in the restraint chair. The reason for the placement in the restraint chair was for attempted suicide. The restraint chair form indicated that Kimberly Andrews was placed in the restraint chair at 1115 on October 22, 2019, but the rest of the form was not filled out, which is in direct violation of ACJ use of force policy. This form is attached to the use of force review that was signed off by Chief Deputy Warden David Zetwo Jr. Why was this action not questioned and proper documentation not addressed? In fact, on one line at the bottom of the sign off page it states "staff actions are in accordance with ACJ polices and procedures." Yes, was typed into the box indicating there were no policies or rules violated.

The fourth use of force that was used on Kimberly Andrews was November 8, 2019. The restraint chair form states that Kimberly Andrews was secured in the restraint chair on 11/8/2019 at 24:45 hours with the explanation for placement being "inmate was refusing to walk and banging her head on the ground." The rest of the form was not filled out and like the previous use of force packet my concerns are the same. Why was the lack of documentation not discovered by the staff that review the use of force packet?

The ACJ staff are using the restraint chair as punishment and retaliation for Kimberly Andrews' behavior. Not only is the restraint chair being used in a way that does not meet current nationally accepted practices, but the restraint chair is also being used in ways that violates ACJ polices.

C. **Review of the Uses of Force against Kimberly Andrews**

1.  It is a nationally accepted practice that all uses of force are to be reviewed by supervisory staff each and every time force is used. It is also a nationally accepted practice that the Warden review all or at least a certain percentage of the uses of force each week. A thorough review of each use of force is done for one reason and that is because at no other time is there more of an opportunity for staff to abuse inmates. Most staff understand and follow the use of force protocol but most experienced correctional professionals know that it is a time when even the best can violate the use of force policy. It is for this reason every use of force packet must be reviewed with a critical eye towards the following:

    - Does the use of force packet have all of the required forms and were they filled out properly?
    - What kind of force was used?
    - Did staff follow the required protocol before using force
    - Is it evident why force was used and was it according to facility policy?
    - Were the videos attached to the use of force packet?
    - Do the video's match the written incident reports by staff?
    - Is further investigation needed?
    - Does the evidence of the use of force packet require submittal to law enforcement?
    - If there are problems with the use of force were responding staff interviewed and given a chance to explain what they did wrong?
    - Are staff disciplined if they violate facility use of force policy?
    - Are problems passed on to the training department so the issues can be added to the annual use of force training that is required?

    It takes time to review use of force packets, but it is a daily requirement for a safe and humane correctional environment. The previously stated data on use of Tasers, use of OC and use of the restraint chair should have been a red flag for Warden Harper that force was being used too much and in excessive ways and was detrimental to Kimberly Andrews. Something was certainly wrong but it

appears that nothing was done it terms of holding staff accountable and making sure inmates were free of unnecessary uses of force.

2.    Kimberly Andrews may possibly be a difficult inmate to manage whether her mental health issues are contributing to her behavior or if it is behavioral. I cannot judge that. It appears that ACJ staff became frustrated and angry over her actions. This never justifies the use of excessive force nor placement in a restraint chair for punishment. Staff must remain calm and follow the rules as written and trained. The Administration at every opportunity must inform staff that the practice of using excessive force is not according to policy and is unacceptable.

I reviewed the following uses of force packets and made the following conclusions:

a.    May 22, 2019 – Kimberly Andrews was in a holding cell naked due to the suicide smock not working properly. Staff were ordered to move Kimberly Andrews from that cell-to-cell 5MD. Kimberly Andrews refused to be cuffed up due to wanting a properly working smock and not wanting to show her bare backside.

- The compliance team did not use de-escalation techniques but used direct orders instead.
- Kimberly Andrews was calm but defiant about refusing to turn around and be cuffed behind her back due to wanting a new smock. Kimberly Andrews stated she would turn around and be cuffed if she received a new smock.
- Cpt. Wiseman told Kimberly Andrews she had to cuff up first and come out of the cell and he would then get her a new smock that worked.
- Why was Kimberly Andrews not given another smock to reduce the use of OC? If it worked, no use of force would have been needed.
- OC was used twice in order to get Kimberly Andrews to follow the order to turn around and cuff up.
- Capt. Wiseman activated SERT in order to extract Kimberly Andrews

- Once SERT was on the scene Kimberly Andrews complied with the order to cuff up.
- SERT removed her from the cell, and it is noticeable that Kimberly Andrews was calm when placed in the restraint chair.
- Kimberly Andrews was calm so the restraint chair should not have been used – she was not combative, verbally active but that is not a reason to use the restraint chair.
- The restraint chair form was not filled out properly
- Videos reflect what was written in the reports by staff

This use of force review was not completed according to ACJ policy as well as nationally accepted protocols. This lack of critical review has become accepted practice at ACJ.

b. May 30, 2019 Kimberly was returned to ACJ after her second suicide attempt. Sgt Alyssa Tucker was ordered to move Kimberly Andrews to housing unit 5MD. Kimberly Andrews was cuffed with her hands in front of her and had leg irons on. The incident was recorded by video that starts with Kimberly and staff entering the hallway by the elevator and then a use of a taser on Kimberly Andrews by Sgt. Tucker.

- A review of the video does not support the written incident report submitted by Sgt. Tucker
- Sgt. Tucker stated that she was pinned against the wall in the hallway by Kimberly Andrews. Video does not support this statement.
- Kimberly Andrews was seen being escorted to the elevator with an officer on the right side holding on to her right arm and an officer on the left side holding onto her left arm. Several additional staff were in the area.
- Kimberly Andrews can be seen turning her head to Sgt. Tucker and being verbally active.
- Sgt. Tucker states that when they approached the door of the elevator Kimberly Andrews broke free from the two staff and moved into the elevator. Sgt. Tucker said that she created space between herself and Kimberly Andrews

with her forearm. Sgt. Tucker yelled taser and fired at Kimberly Andrews' back which made her lose her balance and fall headfirst into the back of the elevator.  Sgt. Andrews deployed the taser once again while Kimberly Andrews was on the floor.

- Kimberly Andrews was pulled from the back of the elevator to the front face down and several staff grabbed her and held her to the floor. Kimberly Andrews continued to move as the officers were grabbing her, and then Sgt. Tucker used the taser once more in a drive-stun method.
- The video does not support the statement that Kimberly Andrews broke free from the two officers holding her.  The officers do not seem startled, nor do they try to regain control of Kimberly Andrews.  Kimberly Andrews' hands were handcuffed as well as her feet.
- Video does not support Sgt. Tuckers report which states she used her forearm to create space between herself and Kimberly Andrews.  Sgt. Tucker used her forearm to push Kimberly Andrews into the elevator which caused Kimberly Andrews to fall forward.
- The use of the taser at that point was an unnecessary use of force and was used as punishment and retaliation.  Why did Kimberly need to be tased?  She was cuffed up, was not assaultive, had nowhere to go and there was plenty of staff to manually subdue Kimberly Andrews.  Additional force was not needed.
- Several staff can be seen on top of Kimberly Andrews, and Sgt. Tucker again used the taser on her.  Kimberly Andrews was squirming and thrashing about, but it was impossible for her to be assaultive since so many staff were now on top of her.
- Kimberly Andrews was placed in a restraint chair and left for 9 hours.  The restraint chair form was not properly filled out and demonstrates that staff are not following ACJ policy.
- The video and the report should be turned over to local law enforcement for further investigation.

- Facility staff should be advised through memo and training that this is not an acceptable use of force.
- The use of the taser in this type of incident has become ACJ's accepted practice but is in total violation of the national use of force standards.as well as ACJ policy. Sgt. Tucker should have been disciplined for her actions and possibly terminated depending on the outcome of the disciplinary hearing.  Sgt. Tucker's actions were retaliatory and intended to cause harm.

c. On October 22, 2019 Kimberly Andrews was seen by staff tearing apart her white jail issued t-shirt, wrapping it around her neck, standing on top of the sink in her cell, and then tying the other end of the white t-shirt around the sprinkler head.  Staff entered the cell, removed her from the sprinkler head and placed her face down on the bed in the cell.  During the next ten minutes, five men held her down while Cpt. Frank cut Kimberly Andrews clothes off, and she pulled on and ripped off Kimberly's underwear.  Kimberly Andrews remained naked while the men held her down and the restraint chair was retrieved. A green blanket was placed over Kimberly Andrews body but was removed and opened up as staff were placing the restraints from the restraint chair on Kimberly Andrews.  Kimberly Andrews appears calm and had stopped banging her head before she was placed in the restraint chair.

- Staff did a good job of responding when it became clear that Kimberly was attempting to harm herself, as this was a potentially life-threatening situation.
- Staff used muscling techniques to control Kimberly Andrews to the table.  Cpt. Frank placed her taser to Kimberly Andrews back but did not use it.
- Why did Cpt. Frank feel the need to strip Kimberly Andrews naked in front of all the men and staff? Why didn't Cpt. Frank just ask Kimberly Andrews to sit up and put the suicide smock on?
- Stripping Kimberly Andrews is unnecessary force without trying lower-level verbal attempts first.

- Kimberly Andrews was placed in a restraint chair and was calm when this occurred. Mental Health should have been called to determine why she needed to go into a restraint chair for her protection or if she could be placed back into a cell with a suicide smock.
- Restraint chair form was not filled out properly.
- Staff are not using lower-level methods of de-escalation and are relying on higher levels of force which are not always necessary.
- This use of force shows that it is accepted practice that any time an inmate does not cooperate or disobeys a direct order they are placed in a restraint chair. This is an unacceptable practice and creates an inhumane environment for inmates to live in.

d. On November 8, 2019 Kimberly Andrews was housed in 5MD. At 12:45 that day Kimberly Andrews was out for exercise which consisted of being cuffed to a table in the day area. Kimberly Andrews was seen with her head down and unresponsive. Medical arrived at the scene and several staff were attempting to figure out what was wrong. Medical held smelling salts up to her nose and eventually Kimberly Andrews became responsive pushing the nurse's hand away from her face. Staff attempted to assist Kimberly Andrews back to her cell when it appeared she could not walk, and the staff then took her to the floor. Kimberly Andrews began to squirm about after she was placed on the floor and being held down by officers. Several staff were present and used muscling techniques to control Kimberly Andrews, but she continued to thrash and flail her arms. Sgt. Radaci and Sgt. Falcone both used their tasers to try to control Kimberly Andrews movement. Sgt. Falcone can be seen sitting on Kimberly Andrews legs using an ankle lock on her legs and then reached around with his taser and deployed the taser into the back of Kimberly Andrews.

- Tasers were used to stop thrashing and flailing activity of Kimberly Andrews because she did not comply with a direct order to stop. It is impossible for Kimberly Andrews to assault someone since she

was on her stomach and several staff were on her using muscling techniques to control her. In fact, Sgt. Falcone is seen on the video siting on the back of both legs which almost completely immobilizes Kimberly Andrew's ability to assault anyone.

- Staff were using pressure points control tactics on Kimberly Andrews which would make anyone squirm due to the pain.
- The use of tasers at this point is an excessive use of force.
- Sgt. Radaci said in his report that Kimberly Andrews started to violently kick her legs. I disagree with this assessment after reviewing the video. Sgt. Falcone is a large man compared to the size of Kimberly Andrews and he was sitting on the back of her legs with her legs bent up at more than a 45-degree angle. Was Kimberly Andrews thrashing and struggling? Yes. But with the 3-4 officers that were on top of Kimberly Andrews she was still thrashing but in no way could she have been harmful to staff or herself. I have seen exaggerated language used in incident reports to justify the use of a higher level of force. I believe in this case this is what Sgt. Falcone did. Kimberly Andrews' movement certainly did not require another drive stun from Sgt. Radaci's taser while several men where on top of her. In my opinion this use of force is retaliatory and unnecessary.
- The restraint chair was summoned, and Kimberly Andrews was put in the restraint chair. The restraint chair form is part of the use of force packet, but it was not filled out properly with only the time she was placed in the chair listed. This continued lack of proper procedure in completing the restraint chair form is against ACJ policy.
- The use of the restraint chair is justified at this point for transport back to her cell. The video shows that staff are moving Kimberly Andrews out of the unit to a cell in processing. Why was she left in the restraint chair for disobeying a direct order to stop thrashing and moving about? Why did staff not first put her back in her cell and monitor her behavior. If she became self-injurious, then the next higher level of force could be used. Could it be more work on the

part of staff?  Of course. This is how appropriate levels of force are to be applied. The use of higher levels of force and the use of the restraint chair has become so common place in ACJ that there is no second thought given by supervisory staff in the use of unnecessary uses of force.

D. **De-escalation Training**

De-escalation training, commonly known as crisis intervention training, is training that is common in all correctional facilities.  It is not verbal communication training which is entirely different.  ACJ has verbal training but they do not have crisis intervention training that assists staff in deescalating a situation where force is not needed.  As I have said before, crisis intervention is not giving direct orders which staff, if trained in the use of de-escalation techniques, would realize that more times than not will escalate a situation.

ACJ staff that were deposed stated they thought they had something like a 40-hour course on verbal techniques in the cadet academy, but they can't remember if they have ever had that training since.  This is understandable since I did not see any evidence of staff using de-escalation techniques nor was there any mention in the use of force policy.

ACJ annual training is similar to many correctional agencies in that only those classes that need hands on observation are taught in person and the rest are taught online at the staff members' convenience.  Classes such as use of tasers, OC, pepper ball, usually require hands on training with a certification every one or two years depending on the manufacturer's recommendation.  Staff must be certified annually or every other year in CPR/first aid depending on the organization that is doing the certification.  These classes require a training instructor to visually watch the staff perform the techniques and movements in a consistent and satisfactory level.

Crisis Intervention training should be the same as the above classes, in-class training each year.  At the very least there should be in-class training of all staff of at least 36 hours of initial training in order to teach and have staff demonstrate all of the skills.  Many states will include an extra day to discuss the use of force policy.  After that initial investment in crisis intervention training then there should be an annual recertification of 8 – 16 hours to refresh and reinforce the

techniques that were taught in the initial class. The class should be instructed with the use of written materials, videos demonstrating good and bad techniques, staff demonstrations, staff role playing and written tests to demonstrate a thorough understanding of the instruction. Sections of the course should address the following topics:

1.    Why crisis intervention is important and what the benefits are in their use.
2.    Techniques as to how staff can stay safe during their day.
3.    How de-escalation fits into the use of force continuum
4.    Defusing techniques.
5.    How to mediate in order to find out what the issues are with one particular inmate or if two inmates who are having issues.
6.    How to interview inmates to get them to talk and share information.
7.    A specific section if the staff member is the one being confronted by a volatile inmate – what to do and not to do.
8.    What staff should do when they see a staff member not managing the situation properly and how to keep the staff member from doing something that is against policy.
9.    How to manage suicidal inmates and what to look for.
10.   Psychiatric crisis and defusing techniques.

The additional training of how to manage suicidal inmates for possible suicidal ideation and managing inmates that are in psychiatric crisis are essential training components for jails. National statistics show that police officers and the county and city jails are the first contacts that mentally ill civilians will make if not in a supervised program. For this reason, training must consist of more than suicide prevention and types of mentally ill inmates. ACJ does provide some of this training but it is not sufficient for staff to manage this large number of mentally ill inmates in a professional and safe way. For years in depth training and understanding was only for the mental health professionals, but jails are learning that it is the line staff that will notice changes and issues long before the inmates are seen by mental health. Line staff need the tools to ask specific questions, not to diagnose, but to gather information to share with mental health when making a referral. Line staff need specific verbal tools to de-escalate inmates that may be having a psychiatric episode. Line staff need specific questions to ask an inmate that they suspect of thinking about suicide. This kind of training is essential in keeping inmates safe. This kind of training is essential in maintaining a safe and secure environment. This

training must be conducted in class and not by computer since staff must be able to verbalize the information learned and demonstrate that they understand the concepts.

Courses that include this type of training will protect staff and inmates with the use of crisis intervention techniques. It will also change the culture of the institution where time and distance and the use of de-escalation skills are the go-to options instead of higher levels of force. Training such as this must be adopted and attended by every staff member including the Warden and his administration. The use of de-escalation skills must be reinforced daily by supervisory staff when reviewing use of force incidents. Supervisory staff should begin to review the use of force incidents with these skills in mind. Could the use of force be managed differently? Could the use of force have been prevented had de-escalation been tried first?

## F. Harmful Effects on Inmates with Psychiatric Disabilities

It is important that staff who work with inmates in prisons and jails are given the tools to adequately manage the ever-increasing numbers of inmates who are diagnosed with a psychiatric disability that may interfere with their ability to understand institutional rules, distinguish between right and wrong, avoid conflict, leading them to act out in ways that staff do not understand. The urgency to address the unique challenges of managing mental health populations is evidenced by the construction of special units in prisons and jails to manage those inmates. Many institutions and jails hang on to the age-old thinking that inmates with psychiatric disabilities are faking their disability or at best malingering. They just need to be taught how to act appropriately by using discipline, restrictive housing and higher levels of force than is necessary. There is now an understanding in the correctional field that this way of thinking is not only harmful to inmates with psychiatric disabilities but also in some ways with inmates in general.

ACJ staff need additional training and specific use of force policy to address the needs of an ever-changing diverse population. If not, inmates are the ones who are hurt or abused. In fact, these tools are effective at keeping staff safe as well as inmates. The lack of proper staff training of de-escalation skills, staff understanding the difference between managing general population inmates as opposed to inmates identified with psychiatric disabilities and the use of force

policy at ACJ not addressing these differences contribute to the abuse of inmates. The case of Kimberly Andrews is an example of how this abuse can happen.

To ensure that inmates who have psychiatric disabilities are treated humanely any use of force including OC and taser, use of the restraint chair and use of restrictive housing must first be reviewed by mental health staff to manage these inmates effectively and safely. Higher levels of force on inmates with psychiatric disabilities may in fact cause an escalation in the event instead of de-escalating the event. Staff need extensive de-escalation training to properly manage these inmates. Lastly, the use of force policy cannot be general in nature but must specifically address use of force on inmates who have been identified with psychiatric disabilities. There must be additional training in use of force for all staff, so they understand the changes in policy and why it is more humane. If not done, inmates will continue to be abused due to higher levels of force than are necessary at ACJ.

VI. **Summary and Concussions**

A. The Warden is responsible to ensure that inmates are not subjected to unnecessary or excessive use of force and that force is only used for legitimate security/safety reasons.

B. Kimberly Andrews was harmed by the use of excessive force which includes the use of tasers and the restraint chair,

C. The ACJ Use of Force policy is written in order to allow force to be used to ensure that inmates comply with all polices in the jail which leads staff to believe that any excessive level of force can be used.

D. Supervisory staff were using the restraint chair for disciplinary and retributive purposes in response to the actions of Kimberly Andrews.

E. Use of force incidents were not thoroughly reviewed which led to the continued excessive uses of force by ACJ staff.

F. Sgt, Tucker used force against Kimberly Andrews that was excessive and retaliatory by deploying her taser three times while Kimberly Andrews was on the ground with her hands cuffed and ankles cuffed which is against ACJ use of force policy and National standards.

G. Sgt. Radaci and Sgt. Falcone used excessive force by each using a taser on Kimberly Andrews while she was pinned to the ground face first by several staff.

H. Cpt. Frank cut off Kimberly Andrews clothing and ripped her underwear from her which left her naked in front of 5 men which was excessive force and embarrassing to Kimberly Andrews.

I. ACJ does not provide staff with training that teaches them how to deescalate a situation without having to use higher levels of force which has created an environment where staff have become accustomed to using higher levels of force than is necessary and harmful to inmates.

J. The Warden and administrators at ACJ could easily have determined that policies had been ignored or violated by conducting a thorough review of each use of force but chose to ratify the dangerous actions of staff rather than mitigating the harm done to Kimberly Andrews.

_____       _____
Bradford E Hansen                         Date

# APPENDIX A

**Bradford E. Hansen**
3640 J Street, Lincoln, NE 68510
Tel: (402) 476-1517 Email: bhansen0723@gmail.com

---

## Summary

Forty-two years of progressive experience in all aspects of adult corrections coupled with specialization in Investigations, Emergency Preparedness Training Development, Crisis Intervention, Conflict Resolution, and Institutional Security Evaluations.

## Professional Experience

**Consultant: Hansen Criminal Justice Consulting** (2019 - Present)
Serve as expert witness and subject matter expert related to in-custody use of force matters, training needs assessments, restrictive housing evaluations, and lead instructor for Crisis Intervention and Conflict Resolution Training Course.

**Warden: Tecumseh State Correctional Institution (TSCI)** (2016 – 2019)
Served as the Chief Executive Officer of the maximum/medium security facility that houses adult male inmates and prepares inmates to transition to lesser custody levels including community custody over time when programming and sentence requirements are met. This facility housed 1,000 maximum and medium inmates which included a 196-bed restrictive housing unit. Directed the work of 420 staff in the areas of security, staff training, medical, mental health, unit management, development of procedures and post orders, accreditation, and reception/orientation. Plans, organizes and coordinates prison operations with other functions within the agency, and to ensure program objectives and standards are established and attained. Responsible for conducting critical review of serious incidents which included disturbances, inmate death and staff assault. Reviewed all use of force reports to ensure compliance with policy. Managed 2.3-million-dollar annual budget. Other duties included testifying in front of legislative committees as well as answering interrogatories and testifying in court.

**Investigations Supervisor: Nebraska Department of Correctional Services (NDCS)** (2003 – 2016)
Designed and led the NDCS Investigations Unit. Supervised all NDCS investigations statewide at ten correctional facilities, two community corrections centers, and in the community with nexus to State corrections. Supervised

criminal and administrative investigations involving staff, parolee, inmate, drug trafficking, assault, sexual assault, PREA, fugitive locate and apprehension operations, terroristic threats, special assignments, outside agency assistance, and internal affairs investigations of prison staff and management. Reviewed related policy and made recommendations for staff oversight and accountability. Assisted facility administrators and command staff with investigative process and investigative planning on sensitive or complex cases. Served as liaison with external law enforcement and County Attorney Offices throughout Nebraska.

**Agency Training Administrator, NDCS (2012 – 2016)**
Duties included the oversight and supervision of the Department training academy, which included new officer training, in-service training, leadership training for supervisors, leadership training for executive staff and development of new training to assist in the development of all staff. Implemented LETRA's Crisis Management training which included communication skills with inmates, how to deescalate crisis events, how to conduct conflict resolution and how to interview inmates to determine if they are suicidal or experiencing a psychotic episode. Staff were taught to document such interactions and make referral to mental health specialists and/or shift supervisors. The course is four days in length and all staff were required to attend the training. Implemented policy, procedure, and training for the implementation and use of chemical agents. Certified in Franklin-Covey 7 Habits for Highly Effective People and Leadership: Great Teams, Great Leaders, Great Results.

**Agency Emergency Management Supervisor: NDCS (1997 – 2015)**
Supervised the Emergency Tactical teams which included the Special Operation Response Team (lethal force team), Correctional Emergency Response Teams (less lethal team which used impact weapons as well as gas delivery systems) and the Crisis Negotiation Team. Developed training, techniques, decision making and assault plan development. Selected and approved all members. Certified as an Emergency Preparedness instructor and instructed all department employees in the emergency preparedness plan. Responsible for conducting critical incident reviews to determine what went well and what could have been done better. The critical incident review included a written report as well as an action plan with identified tasks to be completed. Developed and implemented emergency plans for each institution which included a pandemic emergency plan for the swine flu in 2009. Developed and implemented Department policy and training concerning the use of Oleoresin Capsicum (OC) as a personal protection for staff and the use of pepper ball delivery system in powder form pelargonic acid vanillyl amide (PAVA) in 2012.

**Officer/Unit Administrator/Administrative Assistant: NDCS (1977 – 1997)**
**Lincoln Correctional Center and Nebraska State Penitentiary**

Started as a correctional officer and promoted through the ranks to unit administrator. Responsible for managing all inmate housing units, classification, accreditation, litigation reports, member of the executive team that developed standards and operating procedures, conducted inspections to ensure compliance with safety and sanitation standards.

## Expert Witness Experience (plaintiff and defendant)

1. *Casey Teskoski v. Wood County - Case No: 19CV 95 – expert witness for the plaintiff(completed) – 2019 (suicide)*
2. *Tyreke Vann-Marcouex v. Wood County– Case No: 19 CV 94 - expert witness for the plaintiff (completed) – 2019 (suicide)*
3. *Juan Geronimo Mendoza v. Collette Peters (Oregon Department of Corrections) – Case No: 2:18-CV01663-HZ – expert witness for the plaintiff (current) – 2019 (use of force)*
4. *James Werby v. Collette Peters (Oregon Department of Corrections) Case No: 2:18-CV01828-HZ – expert witness for the plaintiff (current) – 2019 (use of force)*
5. *Estate of Brandi M. Lundy v. State of Tennessee (Department of Corrections) Claim no. T20191358 – expert witness for the claimant (current) – 2020 (suicide)*
6. *Brenda Kay Nordenstrom v. Corizon Health, Inc: Clackamas County, Oregon, Civil*
   *Action No, 3:18-cv-01754-HZ – expert witness for the plaintiff (current) – 2020(wrongful death)*
7. *New Mexico Immigrant Law Center complaint against ICE at the Torrance County Detention Center – November 2020 – expert witness for the plaintiffs who were sprayed by pepper spray (current) 2020*
8. *Dence v. Wellpath et al. – case number 1:20-cv-00671-CL, March 2021 – expert witness for the plaintiff (current)Law office of Chad Haley – Portland, Oregon- wrongful death*
9. *Kimberly Andrews v Allegheny County et al. – case number 2:19-cv-00670-CCW, (current) Abolitionist Law Center, Pittsburg, PA – Bret Grote*
10. *Yahi Abdul Shiheed v Brandon Opel et al- April 2021- expert witness for the plaintiff (current)Law Office of Galligher Evelius & Jones – James Bragdon, Baltimore, MD*

## Consulting and Training Experience

**Consultant: LETRA, Campbell, California (1997 to present)**
Conducted Emergency Preparedness assessments in Washington State and Alabama which included visiting institutions, interviewing staff, evaluating day to day security, reviewing current emergency plans and making recommendations

for improvement.  Initiated and supervised state-wide emergency preparedness training for South Carolina Department of Corrections, Delaware Department of Corrections, New Jersey Department of Corrections, Douglas County Jail, Omaha, Nebraska, and New Mexico Department of Corrections. All states included instructor training and certification. Conducted Crisis Intervention – Conflict Resolution instructor training for the California Youth Authority and the Hawaii Department of Corrections. Conducted training of new instructors for Crisis-Intervention-Conflict Resolution March 1-13, 2020, Stockton, California for the California Youth Authority.  Use of Force training for the Santa Clara County, California jail system.

**National Institute of Corrections (NIC) – (1999 – 2008)**
Conducted instructor certification in Crisis Negotiations in South Dakota Department of Corrections, New Mexico Department of Corrections, and Nevada Department of Corrections.

## Education

**Bachelor of Arts (BA)**, University of Nebraska at Lincoln – Graduated 1976

## Instructor-level Certifications

Lean Six Sigma Executive Green Belt 2018
Franklin Covey Great Leaders Instructor 2010
Franklin Covey Seven Habits Instructor 2007
Advanced Emergency Preparedness for Commanders 2002
LETRA Master Instructor 2001
Crisis Negotiator Basic Class 1999

## Awards, Publications, and Addresses

Keynote Speaker for Correctional Association of Correctional Training Personnel – 2019
Published "Preparing Leaders for Tomorrow" in Corrections Today – 2012

## Professional Organizations

American Correctional Association
Correctional Peace Officers Foundation
Chamber of Commerce

# APPENDIX B

Bradford E Hansen
3640 J Street
Lincoln, Nebraska 68510

Email: bhansen0723@gmail.com
Phone: 402-476-1517

***Expert Witness Fee Schedule (6/1/2020)***

1. Conference calls, document review, interviewing staff/inmates, attend meetings, on-site evaluation, writing reports – 225.00 an hour

2. Testimony at deposition or trial: 250.00 per hour (Minimum charge $1,000 or 4 hours per day)

3. Airfare, car rentals, lodging, incidentals while on travel status: Cost reimbursable

4. Retainer: 2,000

5. Initial case review, typically up to 4 hours: No charge if not retained or if case declined. Charged at case preparation rate if retained and case accepted.

# APPENDIX C

Documents reviewed for Kimberly Andrews v. Allegheny County

1. National Commission on Correctional Health Care (NCCHC) 2018
2. Core Jail Standards – American Correctional Association (ACA – First Edition
3. Amended Complaint – Kimberly Andrews v. Allegheny County
4. Allegheny County Bureau of Corrections Use of Force Policy # 201 effective 10/2/14 revised 4/28/20
5. Allegheny County Bureau of Corrections Inmate Disciplinary Procedures #500 effective 4/14/14 revised 9/28/20
6. Allegheny County Bureau of Corrections Emergency Restraint Chair policy #208 effective 5/28/08 revised 4/28/20
7. Use of Force video on Andrews, October 22,2019
8. Use of Force video Wiseman, May 22, 2019
9. Use of Force video SERT, May 22, 2019
10. Use of Force video Falcone and Tucker, November 8, 2019
11. Use of Force video Falcone and Radaci, November 8, 2019
12. Use of Force video Tucker, hallway leading to elevator
13. Use of Force video Tucker, elevator
14. Use of Fore video spitting incident, September 11, 2019
15. Use of Force video spitting incident, September 11, 2019
16. Tucker Use of Force select screen shots, October 22, 2019
17. Tucker Use of Force select screen shots, October 22, 2019
18. Use of Force packet – 5/22/19 AC006596 – AC006607
19. Use of Force packet – 10/22/2019 – AC 6344 – AC 6362
20. Use of Force packet – 11/8/19 – AC3523 – AC3539
21. Use of Force packet – 5/30/19 – AC1036 – AC1051
22. Restraint Chair Form - 5/23/19 – AC0998 – AC0998
23. Use of Force packet – 5/22/19 AC0967 – AC-0981
24. Restraint Chair Form – 5/30/2019 AC-0999 – AC-0999
25. Wiseman deposition – 2/12/2021
26. Williams deposition – 1/13/2021
27. Tucker deposition – 10/29/2020
28. Radaci deposition – 10/29/2020
29. Andrews deposition – 12/16/2020
30. Justice deposition – 1/19/2021
31. Harper deposition – 10/26/2020
32. Frank deposition – 1/14/2021
33. Falcone deposition – 10/29/2020
34. Barfield deposition – 1/19/2021

35. Certification test – AC-6341-AC – 6342
36. User Test Part 1 – Ac-6336 – AC-6339
37. Use of Force Training Curriculum – AC-6285 – AC-6321
38. Use of Force and Tactical Curriculum – AC-6080 - AC-6247
39. Test – AC-6078 – AC-6079
40. Restraint Chair test – AC-6073 – Ac-6074
41. Taser 7 Certification AC-5911 – AC-5912
42. Suicide Prevention and Intervention quiz – AC-5907 – AC-5908
43. Suicide Prevention and Intervention curriculum – AC-5848 – AC-5906
44. Advanced Defensive Tactics test Ac-5800 – AC-5800
45. Restraint Chair curriculum – AC – 5752 – AC – 5799
46. Pressure. Point test – AC-5745 – AC-5750
47. OC written test – AC-5740 – AC-5744
48. OC recertification curriculum – AC-5685 – AC-5734
49. Mental Health Issues curriculum – AC5644 – AC-5684
50. Verbal De-escalation curriculum – AC-5596 – AC-5641
51. Participants guide to OC practical exercise – AC-5595 – AC-5595
52. Positional Asphyxia – sudden death – AC-5592 – AC5594
53. Use of Force Curriculum – AC –5405 – AC -5395
54. Use of Force Continuum – AC–5392 – AC-5392
55. Emergency Restraint Curriculum – AC-5340 – AC-5391
56. Controlling Aggressive Behavior curriculum – AC-5315 – AC-5339
57. Basic Defensive Tactics curriculum – AC-5203 – AC- 5298
58. Suicide Prevention -2019 curriculum – AC-5049 – AC-5095
59. Verbal de-escalation curriculum 2019 – AC-5003 – AC-5048
60. Interpersonal Skills 2018 curriculum – AC-4922 – AC-4948